# United States Court of Appeals
## For the First Circuit

No. 03-1970
No. 03-2285

LISCHEN RIDLEY,
individually and on behalf of members of the
congregation of the Church with the Good News; and
CHANGE THE CLIMATE, INC.,

Plaintiffs, Appellants,

v.

MASSACHUSETTS BAY TRANSPORTATION AUTHORITY; and
MICHAEL H. MULHERN, in his official capacity,

Defendants, Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Robert E. Keeton, Senior U.S. District Judge]

Before

Torruella, Lynch, and Lipez, Circuit Judges.

Harvey A. Schwarz, with whom Laurie A. Frankl, Rodgers, Powers & Schwartz, Sarah Wunsch, and ACLU Fdn. of Massachusetts were on brief, for appellants.
Rudolph F. Pierce, with whom James A. Aliosi, Jr., Peter N. Kochansky, and Goulston & Storrs were on brief, for appellees.

November 29, 2004

**LYNCH**, <u>**Circuit Judge**</u>.  These two appeals, consolidated at the request of all parties, raise First Amendment challenges to the rejection of proposed advertising submitted to a Boston-area public transit system, the Massachusetts Bay Transportation Authority ("MBTA").

In <u>Change the Climate, Inc.</u> v. <u>MBTA</u>, No. 03-2285, the MBTA rejected three advertisements designed to raise questions about marijuana laws on the stated ground that the ads would promote illegal use of marijuana among children.  The other case, <u>Ridley</u> v. <u>MBTA</u>, No. 03-1970, involves the rejection of one advertisement from a religious group on the grounds that the ad violated the MBTA's guidelines prohibiting advertisements which demean or disparage an individual or group of individuals.  Several First Amendment doctrines are at issue.

Change the Climate brought suit in federal court on May 18, 2000.  The lead argument is that the MBTA advertising space is a designated public forum and so the rejection of the advertisements is unconstitutional.  Change the Climate strongly urges the court to decide the forum issue, arguing:

> Determining the nature of the "forum" at issue is a mandatory first step in deciding a First Amendment case such as the present one because "[t]he extent to which the government can control access depends on the nature of the relevant forum."  <u>Cornelius</u> v. <u>NAACP Legal Defense and Educ. Fund</u>, 473 U.S. 788, 800 (1985).  Both the protection provided for the plaintiff's First Amendment expression and the government's ability to restrict the

> plaintiff's speech vary according to the forum in which the speech is proposed. Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 44-46 (1983). A reviewing court's first action, therefore, must be to conduct a "deliberate analysis, e.g., Chicago Acorn v. Metro. Pier & Expo. Auth., 150 F.3d 695, 702 (7th Cir. 1998)" and determine "the nature of the forum first." New Eng. Reg'l Council of Carpenters v. Kinton, 284 F.3d 9, 20 n.4 (1st Cir. 2002). In Kinton, this Court specifically rejected as "awkward" skipping this crucial forum analysis as a first step "because it requires a reviewing tribunal to know the results of a test before knowing which test applies." Id.

Because the MBTA has created a designated public forum, it argues, "a content-based prohibition must be narrowly drawn to effectuate a compelling state interest," and the MBTA has violated these standards. In addition, Change the Climate argues, no matter what the nature of the forum, the MBTA's rejection of its ads constitutes viewpoint discrimination. It also argues that the guidelines under which the ads were rejected must be narrow and objective and cannot leave excessive discretion in state officials, and the MBTA guidelines do not comply. Finally, Change the Climate argues the district court erred in not awarding it attorney's fees.

Lischen Ridley filed suit in state court on January 8, 2002, on behalf of herself and other members of the Church with the Good News ("Good News"). The MBTA removed the Ridley action to federal court. The suit alleged that the MBTA lacked compelling reasons to reject the advertisement, that the rejection of the advertisement was the product of viewpoint discrimination, and that

-3-

the MBTA's guideline involved was not narrowly tailored and was too vague to withstand constitutional scrutiny.

Although Ridley did not discuss the forum issue in her brief, the brief did note that the outcome of the forum issue in Change the Climate would govern the Ridley case. Ridley's reply brief also argued the public forum line of cases and expressly challenged the MBTA's assertion that the restrictions were reasonable, a standard of review which applies if the forum was not a public forum. And at oral argument, in response to multiple questions from the court as to the relationship of Ridley's claims to the forum analysis issue, counsel for Ridley argued that the forum analysis was relevant to Ridley's claims and could be dispositive of those claims. For example, Ridley argued that if the MBTA had created a public forum as argued in Change the Climate, she would be entitled to judgment on that ground. Further, counsel for both Ridley and Change the Climate moved to consolidate the appeals on the grounds that common issues of fact and law were present and the same lawyers represent both plaintiffs.

The district court denied all forms of relief to Ridley on June 5, 2003. The court assumed that the MBTA advertising program constituted a non-public forum and held that the rejections of Ridley's advertisements were not based on viewpoint discrimination, but rather on a valid "content restriction

-4-

prohibiting demeaning or disparaging content." The trial court held that the factual record based on the stipulation was insufficiently clear for it to grant the relief Ridley requested on whether the guidelines were viewpoint discriminatory on their face or whether they were too vague and gave MBTA administrators too much discretion. Nonetheless, the court revisited the Ridley guideline question when it issued its Change the Climate opinion.

On August 1, 2003, the district court also found for the MBTA in Change the Climate, again avoiding the forum issue. However, consistent with the law on non-public fora, the court reviewed the MBTA's guidelines and its decision to reject these ads under a reasonableness test. The court found that each of the three advertisements provided misleading messages about the legality of marijuana, and that two of the ads targeted minors. As such, the court held, the MBTA's rejection of the ads was reasonable and not viewpoint discriminatory. The district court also found that the MBTA guideline prohibiting materials which promote illegal activity was not viewpoint discriminatory on its face. Nonetheless, in its Change the Climate opinion, the court also said that the Ridley guideline prohibiting demeaning or disparaging material was "somewhat vague" on its face and "still leaves too much room for arbitrary decisions." As a result, in its judgment, the district court ordered:

> The court retains jurisdiction to consider any
> well supported motion for modification of the

-5-

>MBTA's amended guidelines and for modification of this Final Judgment grounded on some change of law or change of relevant factual circumstances occurring after the date of this judgment. The motion must be accompanied by a precise showing of the change of law or change of relevant factual circumstances.

The court also rejected Change the Climate's motion for attorney's fees.

In this opinion covering both cases, we address the parties' arguments about what type of "forum" the MBTA advertising program constitutes. We hold first that the MBTA did not create a public forum. Second, we address whether the MBTA's pertinent guidelines and its decisions to reject both parties' advertising are unlawful as a form of viewpoint discrimination or as an unreasonable use of the forum. We hold that the guidelines on their face are viewpoint neutral and reasonable, and that the decision to reject the Ridley ad was neither viewpoint discriminatory nor unreasonable. However, we hold that the rejection of the three Change the Climate ads constituted viewpoint discrimination and was unreasonable. Finally, we consider the challenge that the guidelines at issue in both cases are vague and delegate too much discretion to the MBTA's employees. We hold that the pertinent guidelines are not facially unconstitutional.

Facts

There are no disputed facts in this case, only disputes as to what conclusions are to be drawn from those facts. Although only the present 2003 MBTA advertising policy is at issue, we recount the history of dealing between the parties, which is pertinent both to the public forum claim and to other claims. Some facts are reserved for discussion as to the particular party.

A.  Facts as to the MBTA

The MBTA is a quasi-governmental organization whose purpose is to provide public transportation in the Commonwealth of Massachusetts. Mass. Gen. Laws ch. 161A, § 5. The MBTA provides transportation to 1.2 million customers daily and to 2.5 million people in the Greater Boston area. For many riders, the MBTA is the only transportation option available. The MBTA operates approximately 170 bus routes, four subway lines, a 13-branch commuter rail network, and six ferry service routes. The MBTA has partnered with the Boston School Department to provide transportation to up to 60,000 Boston public school students annually. The MBTA distributed approximately 15,000 to 20,000 passes to Boston students, the vast majority of whom were in high school.

The principal purpose of the MBTA advertising program is to generate and maximize revenue. The MBTA has statutory

directives both to "maximize and increase total fare revenue and ridership," as well as to "establish and implement policies that provide for the maximization of nontransportation revenues from all sources." Mass. Gen. Laws ch. 161A, § 11. The advertising program effectuates this second purpose. The MBTA has about 40,000 advertising spaces, including interior "car card" displays in buses, trains, and trolleys, king size and tail-light exterior displays on buses, and station and platform displays.

Through a private advertising contractor, Viacom Outdoor of Braintree ("Viacom"), the MBTA attempts to sell all of its advertising space at the usual commercial rates. If all space is not sold at those rates, the MBTA policy is first that it may, without cost to itself, "display advertisements or announcements calculated (i) to increase its revenue, public travel, or goodwill or (ii) as compensation to companies which provide beneficial services to the Authority or (iii) to be otherwise in the public interest." Only if there then remains advertising space unsold does the MBTA, as a third choice, sell advertisements at a reduced rate to nonprofit, tax-exempt public charities or governmental agencies to fill the remaining space. The MBTA charges a fee of 50% of the full commercial advertising rate to those nonprofit organizations. The advertisements at issue in both cases here fall into this last category. All advertisements, of whatever type, are subject to guidelines.

The MBTA recognizes that its two statutory directives, maximizing fare revenue and ridership and maximizing non-transportation revenue, can at times be at odds. In numerous instances over the years, the MBTA has received significant complaints from its customers about particular advertisements. The MBTA management was concerned such complaints would threaten ridership and fare revenue. Often those ads had been placed by the MBTA's advertising contractor without seeking prior MBTA approval. The MBTA then reviewed the advertisements; usually the contractor had violated the guidelines by accepting the advertisements. The MBTA has, accordingly, from the inception of its advertising program in 1992, adopted both substantive and procedural guidelines, described below, to limit the types of advertisements it would accept. Indeed, in attempting to increase ridership, the MBTA initiated a Courtesy Counts program and distributes a brochure that says: "We're committed to courtesy."

B. Facts as to Plaintiffs' Advertisements

1. Change the Climate

Change the Climate, a not-for-profit group, conducts provocative advertising campaigns in order to generate debate about the laws criminalizing the use of marijuana. It has conducted such advertising campaigns in Washington, D.C., in part using advertising on the Metro transit system. It sought to do the same in Boston, starting in 1999, by submitting three advertisements

-9-

designed to catch people's attention and make them rethink the wisdom of the drug laws.

The first advertisement, (the "Teen Ad"), is a color photograph of a teenage girl with a baseball cap on backwards, with a caption saying: "Smoking pot is not cool, but we're not stupid, ya know. Marijuana is <u>NOT</u> cocaine or heroin. Tell <u>us</u> the truth . . ." Change the Climate sought to place this advertisement on poster cards on the inside of buses.

The second advertisement, (the "Mother Ad"), contains a picture of an adult female who is writing on a white board, saying: "I've got three great kids. I love them more than anything. I don't want them to smoke pot. But I know jail is a lot more dangerous than smoking pot." Change the Climate sought to place this advertisement in MBTA subway stations.

The third advertisement, (the "Police Ad"), is a color photograph of two policemen standing in front of an American flag, with text stating: "Police are too important . . . too valuable . . . too good . . . to waste on arresting people for marijuana when _real_ criminals are on the loose." Change the Climate sought to run this ad on the exterior of buses, as it had done earlier in the Washington, D.C. transit system. All three advertisements also contain the web site address, www.changetheclimate.org.

The MBTA's marketing director, Lucy Shorter, rejected the ads in January 2000. The reasons stated were that (1) the three ads promote the use of marijuana, and (2) the three ads were really "reform" ads as part of an effort to legalize marijuana and as such were in conflict with the MBTA's policies on drugs and alcohol. She attached to her rejection letter the MBTA's workplace rules on drug and alcohol use, the advertising guidelines, and the prohibition on advertising tobacco products. It appears the MBTA's "policies" on drugs to which she referred were internal MBTA workplace rules. There were no advertising guidelines dealing specifically with marijuana or other drugs. The MBTA continued to reject the ads for different stated reasons at later times, as discussed below. In sum, the MBTA's 2003 revised guidelines prohibit advertisements which promote the use of illegal goods or services or unlawful conduct. The MBTA has stated that each of the ads promoted illegal use of marijuana by juveniles.

2.   Ridley

Good News has advertised in the past on the radio, in the Yellow Pages, in the newspaper, and via posted messages on vehicles, including a motor home.

On November 29, 2001, Ridley submitted the first of what would be three advertisements to the MBTA's advertising representative, Viacom. The copy read:

> Christians in the Bible never
> observed "Christmas"

-11-

> neither did they believe in lies
> about Santa Claus, flying reindeer
> elves and drunken parties.
> How can you honor Jesus with lies?
> prophet-andre.com

Viacom initially balked at running the advertisement, saying it fell afoul of the MBTA's then-guideline (since replaced) permitting it to exclude any "advertisement that is indecent as to child viewers, or is of a nature to frighten children, either emotionally or physically." After a delay of two weeks and after Ridley's ACLU attorneys contacted the MBTA, the MBTA decided to allow the advertisement on December 15, 2001, for a four week contract. The advertisement was displayed at the Park Street and Downtown Crossing MBTA stations, two major stations.

On December 26, 2001, Ridley asked the MBTA to change the content of the advertisement that was posted in the MBTA system for the last two weeks of her existing contract. The new copy stated:

> The Bible says in Rev 12:9 "And Satan which
> deceiveth the whole world." Yes, Satan set up
> over a thousand false religions in the world
> causing wars, racism and hatred in the world.
> There is only one true religion. All the rest
> are false. www.prophet-andre.com

The MBTA rejected the advertisement, finding both that the advertisement's own text conflicted with a guideline and that the text referenced a website which, upon examination, contained text that violated that same guideline.[1] The then-extant guideline

---

[1]The website read, in part,

read: "The MBTA will not accept advertisements . . . that denigrate groups based on gender, religion, race, ethnic or political affiliation for display in and upon the Authority's transit facilities."

Ridley sought a preliminary injunction to force the MBTA to post the second advertisement. The district court denied the request on January 28, 2002, and Ridley filed an interlocutory appeal with this court. As recounted below, that appeal was mooted.

The MBTA promulgated a new set of "Interim Guidelines Regulating MBTA Advertising" on April 12, 2002. One of the 2002 guidelines provided that the MBTA "shall not display or maintain any advertisement" that is:

> <u>Demeaning or disparaging</u>. The advertisement contains material that demeans or disparages an individual or group of individuals on the basis of race, color, religion, national origin, ancestry, gender, age, disability, ethnicity, or sexual orientation.

The revised 2002 guidelines also reflected the results of an MBTA internal debate over when the MBTA would look at the contents of a website listed in an advertisement. The MBTA had considered the

---

These are some of the false religion [sic] Satan set up:
CATHOLICS
BAPTISTS
PENTECOSTALS
JEHOVAH WITNESSES
MUSLIMS
SO CALLED JEWISH

-13-

listed website when initially rejecting Ridley's second advertisement. Under the 2002 guidelines, the contents of a referenced website would only be considered and judged under the guidelines when "the message or sponsorship of the advertisement cannot reasonably be determined without reference" to that website. The 2002 guidelines formalized a more comprehensive review procedure with four different layers of scrutiny (by Viacom, the MBTA Contract Administrator, the MBTA General Counsel, and the MBTA General Manager) before any advertisement could be rejected based on the guidelines.

The MBTA told Ridley on April 25, 2002, that under these new guidelines, it would accept her second advertisement. Based on this change of stance, this court dismissed Ridley's appeal as moot on July 26, 2002.

By this time, Ridley no longer wanted to post her second advertisement. On June 13, 2002, she submitted a third advertisement to the MBTA, the one now at issue. The ad stated:

> The Bible teaches that there is only one religion. There are no scriptures in the Bible that teach that God set up the Catholic religion, the Baptist religion, the Pentecostal religion, the Jehovah's Witness religion or the Muslim religion. These religions are false. The Bible says in Revelation 9:12, "And Satan, which deceiveth the whole world." The whole world is going to hell if they do not turn from their ungodly ways. God sent Prophet Andre into this world to teach the people the Truth. www.prophetandre.com.

The MBTA rejected this third advertisement in writing on August 14, 2002, after the full review procedure, on the basis that the ad demeaned or disparaged a list of specific religions in violation of the 2002 guideline.

On January 17, 2003, the MBTA issued a revised third set of guidelines.[2]  Under the 2003 guidelines, the MBTA "shall not display" advertisements that are:

> Demeaning or disparaging.  The advertisement contains material that demeans or disparages an individual or group of individuals.  For purposes of determining whether an advertisement contains such material, the MBTA will determine whether a reasonably prudent person, knowledgeable of the MBTA's ridership and using prevailing community standards, would believe that the advertisement contains material that ridicules or mocks, is abusive or hostile to, or debases the dignity or stature of, an individual or group of individuals.

The MBTA concluded that the third advertisement did not comply with the 2003 guidelines.

The 2003 guidelines explicitly articulated other prohibitions as well:  the MBTA will not accept advertisements for tobacco products or ads containing a depiction of firearms or graphic violence, or ads that promote use of illegal goods or services or unlawful conduct.  The guidelines also prohibit ads

---

[2]Those guidelines were the result of the work of an advisory board constituted by the MBTA after the district court issued its interlocutory order in Change the Climate v. MBTA, 214 F. Supp. 2d 135 (D. Mass. 2002).

containing profanity, obscene or sexually prurient material or nude images (as those terms are defined in state law), false or misleading commercial speech, libelous speech, or copyright infringing speech. The guidelines further prohibit "political campaign speech," defined as: "speech that (1) refers to a specific ballot question, initiative, petition, or referendum, or (2) refers to any candidate for public office." Finally, the 2003 guidelines prohibit any advertisement that contains, implies, or declares an endorsement by the MBTA or the state.

## II.

We engage in de novo review of ultimate conclusions of law and mixed questions of law and fact in First Amendment cases. Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, 515 U.S. 557, 567 (1995); Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 501 (1984).

Change the Climate argues that the MBTA has created a designated public forum and thus its decision to reject any advertising must meet strict scrutiny standards. Public forum analysis itself has been criticized as unhelpful in many contexts, and particularly this one where the government is operating a commercial enterprise earning income from permitting advertising. See, e.g., Laurence H. Tribe, American Constitutional Law § 12-24, at 992 (2d ed. 1988) ("[W]hether or not a given place is deemed a 'public forum' is ordinarily less significant than the nature of

-16-

the speech restriction--despite the Court's rhetoric."); Frederick

Schauer, Principles, Institutions, and the First Amendment, 112

Harv. L. Rev. 84, 97 (1998) ("Of all of the paths down which the

Court might go in dealing with the government enterprise cases, the

so-called 'forum doctrine' appears least satisfactory.").  Change

the Climate relies heavily on the public forum argument and

requests that the issue be decided.

The Supreme Court has discussed different types of fora:

traditional public fora, designated public fora, and non-public

fora.  See discussion in Gerald Gunther, Constitutional Law 1292-94

(12th ed. 1991); Tribe, supra,  § 12-24, at 986-97.  Change the

Climate argues that the standard of review for speech restrictions

in a designated public forum is strict scrutiny.  Ridley admits

that a non-public forum (sometimes called a limited public forum)

usually results in application of a lesser "reasonableness"

standard.  We accept arguendo[3] these premises that strict scrutiny

applies to a public forum's exclusion of speech.

---

[3]Contrary to Ridley's assumption, designation of the type of forum does not always dictate the standard of review.  For example, strict scrutiny may not always apply to a public forum.  See Denver Area Educ. Telecomm. Consortium v. FCC, 518 U.S. 727, 741-42 (1996) ("[T]he First Amendment embodies an overarching commitment to protect speech from government regulation through close judicial scrutiny, thereby enforcing the Constitution's constraints, but without imposing judicial formulas so rigid that they become a straitjacket that disables the government from responding to serious problems.").

Plaintiffs argue that while the MBTA's advertising program is not a traditional public forum, the MBTA effectively has created a designated public forum for the expression of ideas because it has accepted a range of advertisements on its vehicles and in its stations.  The MBTA says it has not created a public forum at all.  If it has, the MBTA insists that it is at most a limited public forum,[4] which is the equivalent of a non-public forum, and that its rejection of the advertisements is within the limits appropriate to a non-public forum.

A.  Forum Analysis

The Supreme Court has repeatedly held that the government must have an affirmative intent to create a public forum in order for a designated public forum to arise.  "The government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse."  Cornelius, 473 U.S. at 802.  To determine that intent, courts must consider both explicit expressions about intent and "the policy and practice of the government to ascertain

---

[4]The phrase "limited public forum" has been used in different ways.  We used the phrase "limited public forum" as a synonym for "designated public forum" in Berner v. Delahanty, 129 F.3d 20, 26 (1st Cir. 1997), and again in New England Reg'l Council of Carpenters v. Kinton, 284 F.3d 9, 20 (1st Cir. 2002).  On the other hand, we used the phrase "limited public forum" as a synonym for "nonpublic forum" in Fund for Cmty. Progress v. Kane, 943 F.3d 137, 138 (1st Cir. 1991).  This confusion is echoed elsewhere.  See, e.g., New York Magazine v. Metro. Transit Auth., 136 F.3d 123, 128 & n.2 (2d Cir. 1998).  We adopt the usage equating limited public forum with non-public forum and do not discuss the issue further.

whether it intended to designate a place not traditionally open to assembly and debate as a public forum." Id. We also "examine[] the nature of the property and its compatibility with expressive activity to discern the government's intent." Id. As to the nature of the property, the MBTA does run advertisements and so there is nothing inherent in the property which precludes its use for some expressive activity. That nonetheless leaves the issue of whether particular expressive activity may be inconsistent with the nature of the property. The MBTA has determined that some types of expressive activity are not consistent with the commercial enterprise it runs.

In the 2003 advertising guidelines, the MBTA states expressly that "[t]he MBTA intends that its facilities constitute nonpublic forums that are subject to the viewpoint-neutral restrictions set forth below." Nonetheless, a statement of intent contradicted by consistent actual policy and practice would not be enough to support the MBTA's argument.

Change the Climate argues that we should give little weight to this express statement of intent: paying it heed would allow a government the opportunity impermissibly to censor merely by newly labeling the forum in question a non-public forum. The past history of characterization of a forum may well be relevant; but that does not mean a present characterization about a forum may be disregarded. The government is free to change the nature of any

nontraditional forum as it wishes. Cornelius, 473 U.S. at 802. Thus, even if MBTA's previous intent was to maintain a designated public forum, it would be free to decide in good faith to close the forum at any time. There is no evidence that the 2003 changes were adopted as a mere pretext to reject plaintiff's advertisements. To the contrary, the MBTA acted in response to expressed constitutional concerns about its prior guidelines, and cannot be faulted for trying to adhere more closely to the constitutional line. And if the MBTA revised a guideline merely as a ruse for impermissible viewpoint discrimination, that would be found unconstitutional regardless of the type of forum created.

The plaintiffs' argument assumes that before January 2003, the MBTA had created a designated public forum. That is unlikely: the MBTA has consistently had both significant substantive content limitations and procedural limitations on the advertisements it would accept, and there is little evidence the MBTA affirmatively intended to create a public forum. Even so, the MBTA has not created a public forum in its advertising program under its 2003 guidelines, which are at issue here.

Since 1992, the MBTA has had substantive guidelines prohibiting all tobacco ads, and all libelous, slanderous, or obscene ads. Procedurally, it required all advertisers to submit an application to the MBTA's advertising contractor, which had instructions to send any ads potentially in conflict with the

-20-

guidelines to the MBTA for review, and the MBTA reserved the right to reject any ad it wished. In AIDS Action Comm. of Massachusetts v. MBTA, 42 F.3d 1, 12 (1st Cir. 1994), this court noted that these early guidelines left a lot to be desired.

In 1995 the MBTA further prohibited ads which were indecent to, or designed to frighten, child viewers. Then in 1999, the MBTA created new guidelines which, in addition, prohibited ads containing depictions of violent criminal conduct, firearms, profanity, ads harmful to children, and ads that denigrate groups based on gender, religion, race, ethnic, or political affiliation. These prohibitions are not the indicia of an intent to create a public forum.

The January 2003 guidelines intensify both the substantive and procedural limitations and protections used by the MBTA. The January 2003 guidelines better define the substantive limitations and further ban ads that promote or appear to promote the use of unlawful goods or services or the commission of unlawful conduct, as well as political campaign ads. Procedurally, the 2003 guidelines also create more stringent mechanisms for MBTA review of potentially prohibited ads. Given the litany of limitations on advertisements from the inception of its program, and the strengthening of those limitations in 2003, the MBTA has, at least by 2003, through its policy expressed an intent not to open its

advertising space to all persons and organizations for public dissemination of their views on all topics without limitation.

The MBTA's practice of enforcing its policy further shows that it intended <u>not</u> to create such a forum. In the five years preceding these litigations, the MBTA rejected at least seventeen advertisements that were not in conformance with different aspects of its policy. Various advertisements were rejected for violating, among other grounds, the prohibitions on ads depicting violence, indecency, profanity, denigration of women, and for containing tobacco products.

Change the Climate points to one example of a seemingly contradictory enforcement of the policy with respect to ads containing tobacco in an attempt to argue that the MBTA has erratically enforced its written policy.[5] One or more instances of erratic enforcement of a policy does not itself defeat the government's intent not to create a public forum. See <u>New England</u>

---

[5]Change the Climate introduced evidence that the MBTA refused to display an ad from an organization called the Surfrider Foundation, a group whose goal is to encourage responsible disposal of cigarette butts, on the basis of the MBTA's ban on advertisements for tobacco products because it included a picture of people smoking. The ad contained three pictures of one couple, during which they are smoking, talking, and then disposing of their cigarettes. The ad begins: "We're not one of those organizations who believe you shouldn't smoke! What we care about is how you dispose of your cigarette." The ad then has information about the harmful effects of cigarettes on beaches, and has tips for responsible disposal of cigarette butts. However the MBTA allowed an ad for the airline Al Italia, which contained a picture of a woman on a motorcycle with a cigarette in one hand, with the caption: "Let's create a buzz."

Reg'l Council of Carpenters v. Kinton, 284 F.3d 9, 22 (1st Cir. 2002) (no government intent to create a designated forum exists "even if [government's] policy of restricted access is erratically enforced"). By consistently limiting ads it saw as in violation of its policy, even if doing so imperfectly, the MBTA evidenced its intent not to create a designated public forum.

Most importantly, the relevant Supreme Court case law compels the conclusion that the MBTA has not created a designated public forum. The only Supreme Court case directly on point, the plurality opinion in Lehman v. City of Shaker Heights, 418 U.S. 298 (1974), found that where a city banned all "political" (i.e., candidate and issues) advertising on its transit system, while accepting commercial as well as religious, civic, and public-service oriented advertisements, the city had not created a designated public forum. Id. at 304. The opinion found that "[i]n much the same way that a newspaper or periodical, or even a radio or television station, need not accept every proffer of advertising from the general public, a city transit system has discretion to develop and make reasonable choices concerning the type of advertising that may be displayed in its vehicles." Id. at 303. Lehman is indistinguishable from the instant case. As in Lehman, the MBTA bans political candidate and some overtly political advertising. As here, the transit system in Lehman did not merely accept ads from commercial entities, but also accepted ads from

-23-

"churches, and civic and public-service oriented groups." Id. at 300. In Lehman, the claimant, as here, was denied access to both exterior and interior advertising space. Id. at 320 n.12 (Brennan, J., dissenting). The transit system, as is true of the MBTA here, had written guidelines which were managed by a third party entity, and which involved some exercise of discretion. Id. at 298-300.

Lehman's rationale that a government instrumentality does not become a public forum simply because it is used for communication of ideas has since been reinforced by later Supreme Court cases. See Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 49 n.9 (1983); United States Postal Service v. Council of Greenburgh Civic Ass'ns, 453 U.S. 114, 129 (1981). Lehman was cited favorably in R.A.V. v. City of St. Paul, Minnesota, 505 U.S. 377, 390 n.6 (1992); and United States v. Kokinda, 497 U.S. 720, 725-26 (1990) (plurality opinion). Indeed, in International Soc'y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672 (1992), the court, citing Lehman, reiterated that a lower level of scrutiny usually applies when the government acts as proprietor. Id. at 678.

The only Supreme Court case to which plaintiff points is Widmar v. Vincent, 454 U.S. 263 (1981). Widmar held that where a state university had a policy of opening its campus facilities for all registered student groups, it had created a designated public forum for such groups and thus violated the First Amendment when it

-24-

attempted to prevent a religious student group from using such facilities.  Id. at 277.

Widmar is distinguishable from this case for multiple reasons.  First, the purpose of the forum created in Widmar was to encourage expressive activities by student groups.  Id. at 265.  To implement this purpose, the campus facilities were made generally available to all student groups, without restriction, and so the groups received a form of subsidy from the government.  Id.  Unlike Widmar, the primary purpose of the MBTA advertising program is not to facilitate expression; rather it is to generate revenue.  Further, the restrictions upon use of the MBTA advertising, including the requirement of an application, payment, and the MBTA's extensive policy of limitation, are far greater than in Widmar.

Since Widmar, we know of no analogous Supreme Court case applying the forum analysis which has found that the government had created a designated public forum.  See, e.g., Arkansas Educ. Television Com'n v. Forbes, 523 U.S. 666 (1998); Rosenberger v. Rector and Visitors of the Univ. of Virginia, 515 U.S. 819 (1995), Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384 (1993); Cornelius, 473 U.S. 788; Perry Education Ass'n, 460 U.S. 37; cf. Legal Services Corp. v. Velasquez, 531 U.S. 533 (2001).  In each of these cases, the Court assessed the challenged government

-25-

restrictions only under the reasonableness/viewpoint neutrality test.

Further, the Court has recognized that deference to government intent in determining the nature of the forum may promote, rather than hinder, First Amendment principles:

> [W]e encourage the government to open its property to some expressive activity in cases where, if faced with an all-or-nothing choice, it might not open the property at all. That this distinction turns on governmental intent does not render it unprotective of speech. Rather, it reflects the reality that, with the exception of traditional public fora, the government retains the choice of whether to designate its property as a forum for specified classes of speakers.

Arkansas Educ. Television Comm'n, 523 U.S. at 680.

This court addressed the question of rejection of advertisements by the MBTA a decade ago in AIDS Action, 42 F.3d 1. Although the district court had concluded that the MBTA was a public forum, this court declined to reach the issue. Id. at 9. Instead we held that the MBTA had engaged in dissimilar treatment of advertisements containing sexual content and innuendo, by allowing a rather explicit movie advertisement while rejecting advertisements featuring condoms from an anti-AIDS group. Id. at 10-11. That amounted to the type of content discrimination that "gave rise to an appearance of viewpoint discrimination" which had not been adequately explained. Id. at 11. The decision in AIDS

Action does not assist plaintiffs on the claim that the MBTA has created a public forum.

In Children of the Rosary v. City of Phoenix, 154 F.3d 972 (9th Cir. 1998), then-retired Associate Justice White similarly found that the Phoenix transit system did not create a designated public forum by accepting advertising on exterior panels on buses. Id. at 976. Like the MBTA, the system did not accept advertising from political candidates. The system primarily ran commercial advertising, but did run a small number of non-commercial public service advertisements, excluding political and religious advertising. Id. The case did not, though, address the further issue, which we do, of a transit system which accepts what is apparently more non-commercial advertising.

Likewise, one circuit, relying on Lehman, has recently held that advertising space in bus benches was a non-public forum. Uptown Pawn and Jewelry, Inc. v. City of Hollywood, 337 F.3d 1275, 1278-79 (11th Cir. 2003). Although the city had previously accepted ads from pawnbrokers, it adopted a new policy prohibiting those ads. The court found this was a permissible content-based restriction, seeking to encourage higher caliber advertising to maximize revenue.

The Supreme Court opinions control this case. Nonetheless, we discuss briefly circuit opinions on which Change the Climate relies. Without suggesting we agree with the reasoning

-27-

in each, each is distinguishable on its facts. In each of these cases, unlike here, the system accepted explicitly political advertising, an important (but not dispositive) factor in forum analysis.

In Christ's Bride Ministries, Inc. v. Southeastern Pennsylvania Transp. Auth., 148 F.3d 242 (3d Cir. 1998), a transit system's advertising space was held to be a designated public forum where the system had an affirmative program to use its space to promote "awareness of social issues" and provide "a catalyst for change." Id. at 249-52. Under that program, the advertising manager picked issues of public concern for free advertising. Id. at 249. Further, the plaintiff's advertisements had in fact been approved and had run, and were refused only after they had sparked controversy. Id. at 245-46. SEPTA had no guidelines[6] similar to those of the MBTA. SEPTA also had a practice of "virtually permitting unlimited access," having requested modifications of advertisements only three times. Id. at 252.

---

[6]Its restrictions were only 1) an instruction to its contractor to concentrate on ads other than alcohol and tobacco; 2) that it reserved to itself a final veto without guidelines as to when it would exercise that veto; and 3) it restricted the contract manager from accepting "libelous, slanderous, or obscene" advertisements (which was not the basis for the rejection of plaintiff's advertisement). Id. at 250-51.

Similarly,[7] in <u>Planned Parenthood Ass'n/Chicago Area</u> v.

<u>Chicago Transit Auth.</u>, 767 F.2d 1225 (7th Cir. 1985), the court

found the CTA had created a public forum where it had accepted a

wide range of public-issue advertising, claimed to have a policy of

excluding controversial advertisements, but in fact had no such

policy, had no written guidelines, had accepted controversial

advertisements, and was found to have come up with such a policy

solely to defend its decision to reject plaintiff's advertising.

<u>Id.</u> at 1232-33.

In <u>New York Magazine</u> v. <u>Metro. Transp. Auth.</u>, 136 F.3d

123 (2d. Cir. 1998), the court held that the MTA had created a

public forum in the advertising space outside of its buses when it

accepted a magazine's advertisements using the Mayor's name under

written guidelines which imposed no restriction on political

speech, then removed the advertisements when the Mayor objected.

<u>Id.</u> at 130.

---

[7]In <u>United Food & Commercial Workers Union, Local 1099</u> v. <u>Southwest Ohio Reg'l Transit Auth.</u>, 163 F.3d 341 (6th Cir. 1998), the transit system rejected a union's proposed wrap-around bus advertisement because, in large part, it was too controversial. <u>Id.</u> at 347. SORTA accepted public-service, public issue, political, and commercial advertisements, subject to a policy excluding advertising on political issues controversial enough that they might adversely affect ridership. <u>Id.</u> at 359. The court gave alternative holdings--that if no public forum was created, the restriction was unreasonable, but that SORTA had created a designated public forum by accepting virtually unlimited advertising. <u>Id.</u> at 363.

Change the Climate's additional arguments on the forum issue are equally unpersuasive. It argues that the MBTA made an "affirmative" decision to continue to allow non-commercial advertising, despite being advised that potential disputes could be avoided by simply eliminating non-commercial advertising altogether. This argument suffers from several flaws. As a matter of law, under Lehman, the dividing line between a public forum and a non-public forum is not the dividing line between commercial advertisements and paid advertisements from non-profit groups. And under Arkansas Educ. Television Comm'n, the MBTA is not to be put to an "all-or-nothing choice." 523 U.S. at 680.

Also, as a matter of fact, General Manager Robert Mulhern testified that he rejected a potential solution of removing all non-commercial advertising, because:

> I believe that there's a lot of people out there who rely on that information, that some times that -- that's the only practical access to government they have from time to time. For people who live in the inner city that are made aware of important programs or important social services, [I believe] that we truly are performing a public service in another flavor rather than transportation service. We're letting them know about government services or social services or not-for-profit services that might have a direct impact on their quality of life.

By refusing to limit the advertising program solely to commercial advertising, the MBTA was, thus, not evidencing an intent to open the forum to all public discourse. Nor was the MBTA adopting its

-30-

own program to inform the public about issues, as in Christ's Bride, 148 F.3d 242. The MBTA's decision is not inconsistent with a desire not to create a public forum, nor is it inconsistent with the MBTA's role as a market actor.

Finally, plaintiffs argue that, because prior to this litigation the MBTA did not limit advertisements "in a constitutionally permissible manner," the court should find that it created a designated public forum. This reasoning fundamentally misunderstands the nature of the forum analysis. The focus is on whether the government has intentionally decided to create a public forum. Cornelius, 473 U.S. at 802. If it has not, then erratic enforcement of a policy would not matter. Further, even if the government had limited ads "in a constitutionally impermissible manner" by engaging in viewpoint discrimination, that would not create a public forum where none was intended. The MBTA's policy clearly evidenced an intent to maintain control over the forum, and thus the MBTA did not create a designated public forum. As a result, the standard of review is not strict scrutiny.

B. Viewpoint Discrimination and Unreasonableness Claims in Both Change the Climate and Ridley

Although the MBTA advertising program is neither a traditional public forum nor a designated public forum, regulations are still unconstitutional under the First Amendment if the distinctions drawn are viewpoint based or if they are unreasonable

in light of the purposes served by the forum. <u>Cornelius</u>, 473 U.S. at 806.

The bedrock principle of viewpoint neutrality demands that the state not suppress speech where the real rationale for the restriction is disagreement with the underlying ideology or perspective that the speech expresses. <u>See</u> <u>Rosenberger</u> v. <u>Rectors and Visitors of Univ. of Va.</u>, 515 U.S. 819, 829 (1995); <u>McGuire</u> v. <u>Reilly</u>, 386 F.3d 45, 62 (1st Cir. 2004) ("The essence of a viewpoint discrimination claim is that the government has preferred the message of one speaker over another."). A distinction is viewpoint based if it "denies access to a speaker solely to suppress the point of view he espouses." <u>Cornelius</u>, 473 U.S. at 806. The essence of viewpoint discrimination is not that the government incidentally prevents certain viewpoints from being heard in the course of suppressing certain general topics of speech, rather, it is a governmental intent to intervene in a way that prefers one particular viewpoint in speech over other perspectives on the same topic. <u>See, e.g.</u>, <u>Good News Club</u> v. <u>Milford Cent. Sch.</u>, 533 U.S. 98, 107-09 (school that has opened its resources after school for the teaching of moral values cannot exclude religious group that wishes to teach about those values from a religious perspective without engaging in viewpoint discrimination); <u>Rosenberger</u>, 515 U.S. 819; <u>Lamb's Chapel</u> v. <u>Ctr. Moriches Union Free Sch. Dist.</u>, 508 U.S. 384 (1993); <u>McGuire</u>, 386

F.3d at 57-59, 64-65 (fact that "buffer zone" statute applying around abortion clinics might incidentally burden anti-abortion speech more than pro-abortion speech is irrelevant to its viewpoint neutrality).

1. Change the Climate: Viewpoint Discrimination and Unreasonableness

The advertisements rejected were described earlier. Other material facts follow.

Robert Prince, who was the General Manager of the MBTA at the time Change the Climate's ads were rejected by Shorter, testified that while he had not seen the ads in 2000, he would have rejected all three on the grounds that they encouraged marijuana use among juveniles, and thus were harmful to juveniles and in violation of the then-existing policy. He found the Teen Ad to be "geared towards young people, telling them that marijuana is not cocaine or heroin, so it's the lesser of two evils, but it's okay to smoke it." Prince did not view the ad as sending a message that juveniles should be told the truth about drugs.

Prince thought that the Mother Ad was also harmful to juveniles, because the ad implies "that it's okay to smoke marijuana, which is against the law." Prince said the words meant "that 'I don't want my children to smoke pot, but I know jail is . . . more dangerous, so therefore I'm going to overlook the fact that they are allowed to break the law.'" Prince said that some

people could have the legitimate viewpoint that jail is more harmful to a child than marijuana smoking, but that was not a viewpoint he would allow to be displayed on the MBTA because "[i]t allows [children] to think it's okay to break the law."

As to the Police Ad, Prince stated: "It's telling them that the police are not going to take marijuana smoking very seriously, that there are real criminals on the loose, and it's okay to break the law." He further stated that the ad "says that smoking marijuana will not be looked upon as a criminal act." When asked whether he agreed that the ad expressed a viewpoint about how police should be used, Prince replied: "I know this ad tells young people that they should commit a criminal act."

Michael Mulhern, acting General Manager of the MBTA and the person with final authority to accept or reject advertisements, testified that he would reject all three ads under the current 2003 guidelines. The Teen Ad promoted marijuana use, he thought, by implying that cocaine and heroin were really harmful but marijuana use was not. He held these worries although the ad states explicitly that "[s]moking pot is not cool." Further, he was concerned that the ad was targeted at juveniles, based on the picture of the teenage girl and the fact that the language is written in terms ("cool," "ya know") that juveniles would generally use.

-34-

Mulhern testified that the Mother Ad also promoted marijuana use, and while it was "not as clear" as the Teen Ad, the Mother Ad could also in part be targeted at children. He testified that by depicting a mother stating that she is less concerned about her children smoking pot, the ad sends the message to children that they "can smoke [pot] and still be great kids." Mulhern testified that he would permit Change the Climate to post an ad advocating the opposite viewpoint, saying: "I've got three great kids. I love them more than anything. I don't want them to smoke pot. But if my kids smoke pot, they should go to jail."

Mulhern testified that the Police Ad was rejected because "it suggests that smoking marijuana is not a real crime," and so promotes an illegal activity. He disagreed with the view that "police resources should not be used for marijuana prosecutions." He said he would allow an ad to be posted if it expressed the opposite viewpoint, saying: "Police are important, valuable, good. Police should be used for arresting people for marijuana crimes." Mulhern conceded that the ad did not target children specifically, but stated that he thought that children were more susceptible to receiving the message that marijuana is not a real crime than were other people.

The MBTA also introduced testimony of Cornelia Kelley, the head of the Boston Latin School, a public exam school for grades seven through twelve, which uses the MBTA for transporting

more than 2,100 of its 2,400 students. Kelley had the following concern about the Teen Ad: "There is a message there that marijuana is okay; it's not as bad as cocaine or heroin. And the message, to my mind, that's a very confusing message for young people. There is a sense there that marijuana is acceptable." When asked, despite the fact that the ad says that "Smoking pot is not cool," why it would lead students to think that smoking marijuana is okay, Kelley replied:

> If you look at that ad, that's a real mixed message to young people. And the students with whom I deal get a great deal of stimulation in different ways. And what you're looking at there is not a clear-cut message. And when children . . . are that age, we try and see to it that they understand clearly what's legal and what's not legal. And that really says marijuana is not cocaine or heroin. It takes marijuana out of the realm of cocaine and heroin, where we consistently tell young people that marijuana is an illegal drug and you will be expelled for it or you will be arrested for it . . . .

Kelley conceded that a student would not be disciplined for expressing the view: "Tell us the truth. Marijuana is not cocaine or heroin," but stated that she did not think the ad was appropriate to run on the MBTA because it sends a mixed message to students.

Kelley testified that she was particularly concerned about the Mother Ad because it appeared to depict a teacher at a chalkboard. She felt that by stating that jail is more dangerous

than smoking pot, the ad does not give a clear message to young people that smoking pot is illegal.

Kelley also expressed concern that the Police Ad "conveys that police countenance the use of marijuana." When asked how, she replied that it implies that one will not be arrested for marijuana which is "another mixed message to young people."

Ms. Kelley conceded that her students could easily be exposed to similar ads while walking in the city. The difference was that she considered the MBTA to be an extension of the school house. But even so, she conceded that there had been discussion encouraged in classrooms at the school about the issue of legalizing marijuana.

Change the Climate also introduced evidence of two different types of ads: other ads accepted by the MBTA which could be seen as promoting illegal activity among juveniles and ads which encourage compliance with drug laws. It argues this second set of ads expresses the view that the drug laws are sound.

Change the Climate introduced several different ads for alcoholic beverages accepted by the MBTA in the past. One is an ad for Trinity Oaks Wine, which contains a picture of a woman in a backless dress being hugged by a man. It states: "Trinity Oaks. It's not a soap opera. But it is provocative." At the bottom, the ad states: "Remember the wine," and has a picture of a wine bottle.

Prince testified that this ad was not harmful to juveniles because the ad was addressed to adults.

Another ad, for Doc Otis Hard Lemonade, depicts a woman's mouth eating an ice cube, and states "DO IT ON THE ROCKS." In the corner there is a bottle of "Doc Otis Hard Lemonade," an alcoholic lemonade beverage, being poured into a glass of ice, with the slogan: "The perfect way to break the ice." When questioned as to whether ads such as this were harmful to juveniles, Mulhern conceded that alcohol use was illegal for juveniles, but found that alcohol ads did not fall under this guideline because the ads did not specifically target juveniles. Prince was also asked about this ad and testified that it was not harmful to juveniles because the ad was not addressed to young people, but to adults. When asked how he could tell this ad was "geared towards somebody who's 22 and not somebody who's 20," Prince responded: "Because alcohol for anybody under that age is illegal." Prince conceded that nothing in the ad protected young people from its influence.

Kelley testified that she was also concerned about the advertisements for alcoholic beverages that her students see on the MBTA. The distinction she saw was that alcohol was legal at a certain age but use of marijuana was not legal at any age.

Change the Climate also introduced testimony that the MBTA has run numerous advertisements that discourage drug use. At trial, the MBTA stipulated to having run four such ads. One was

-38-

headlined: "TALK IS BETTER FOR YOUR KIDS THAN DRUGS . . . SO TALK!" It has a cartoon picture of "McGruff, the Crime Dog," as well as 8 pointers for talking to one's children about drugs, such as: "Tell your kids you don't approve of the stuff"  and "Tell them to say no . . . and that you know they know the difference between right and wrong."  The advertisement finishes by stating: "Follow these steps and you'll be helpin' yourself, your kids and me . . . take a bite out of crime."

A second advertisement, sponsored by Drug Free America, contains a picture of two children at a playground, with the headline: "Everyday after school, my kid likes to _____.  If you can't fill in this blank, you need to start asking.  It's a proven way to steer kids clear of drugs.  It's not pestering.  It's parenting.  Ask: Who?  What?  When?  Where?  Questions.  The Anti-Drug."  A third advertisement, sponsored by Partnership for a Drug-Free New England and America, as well as the Office of National Drug Control Policy, states simply: "Are You Waiting for Your Kids to Talk to You About Pot?"  And the fourth advertisement, sponsored by the Office of National Drug Control Policy, contains a pair of dice, one with a skull on one side, and states: "Just because you survived drugs, doesn't mean your children will."

The MBTA's position under the current guidelines is that it would still reject Change the Climate's three ads because each ad targets children and encourages the use of illegal drugs.  The

present guidelines do not prohibit ads "harmful" to children.  The MBTA also takes the position that it would permit ads which expressed to adults the viewpoint that the marijuana laws should be rethought so long as the ads said that use of marijuana is illegal.

At the outset, it should be emphasized that the MBTA's guideline itself, which allows rejection of advertisements that promote illegal activity, particularly among children, is constitutional.  It clearly serves a viewpoint-neutral purpose, and it is surely reasonable given the characteristics of the MBTA's advertising program.  It is indisputable that the MBTA has a legitimate, viewpoint-neutral interest in not being used as a messenger to convey messages promoting illegal conduct among juveniles.  It is also legitimate for the MBTA to consider that it has juveniles among its passengers.  Further, as a vendor, the MBTA has a legitimate interest in not offending riders so that they stop their patronage.  All of these are reasons why the guideline itself is constitutional against a viewpoint-discrimination attack.

What we focus on instead are the specific decisions of the MBTA to reject the three Change the Climate advertisements. The MBTA's mere recitation of viewpoint-neutral rationales (or the presentation of a viewpoint-neutral guideline) for its decisions to reject the three advertisements does not immunize those decisions from scrutiny.  The recitation of viewpoint-neutral grounds may be a mere pretext for an invidious motive.  See Cornelius, 473 U.S. at

811-13. In practical terms, the government rarely flatly admits it is engaging in viewpoint discrimination.

Suspicion that viewpoint discrimination is afoot is at its zenith when the speech restricted is speech critical of the government, because there is a strong risk that the government will act to censor ideas that oppose its own. See, e.g., Texas v. Johnson, 491 U.S. 397, 411-17 (1989) (striking down criminal flag desecration statute; flag-burner's action expressed "dissatisfaction with the policies of this country," expression which was "situated at the core of our First Amendment values," and state had no power to "prescribe what shall be orthodox" (quoting W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943) (internal quotation marks omitted)). Because Change the Climate's advertisements here reflect core political speech that is critical of existing governmental policy, we are especially wary of viewpoint discrimination.

The Supreme Court, as well, has been particularly leery of justifications for quashing speech to adults that rest on the purported protection of children. While the protection of children is a compelling state interest, see Denver Area Telecomm. Consortium v. FCC, 518 U.S. 727, 755 (1996), the Court has carefully examined regulations purporting to rest on this ground, often finding that they sweep more broadly than their goal requires or that they do not serve their goal of child protection at all.

See Reno v. ACLU, 521 U.S. 844, 875-79 (1997) ("[T]he mere fact that a statutory regulation of speech was enacted for the important purpose of protecting children . . . does not foreclose inquiry into its validity."); Denver Area Telecomm. Consortium, 518 U.S. at 755-60; Sable Communications of Cal., Inc. v. FCC, 492 U.S. 115, 126-27, 130-31 (1989); Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 73-75 (1983); Erznoznik v. City of Jacksonville, 422 U.S. 205, 212-14 (1975).

Almost fifty years ago, Justice Frankfurter found unconstitutional a Michigan obscenity statute; he emphasized that the statute swept too broadly to carry out its asserted aim of protecting children from sexually explicit material. In Butler v. Michigan, 352 U.S. 380, 383 (1957), Justice Frankfurter stated:

> The State insists that, by thus quarantining the general reading public against books not too rugged for grown men and women in order to shield juvenile innocence, it is exercising its power to promote the general welfare. Surely, this is to burn the house to roast the pig. . . . The incidence of this enactment is to reduce the adult population of Michigan to reading only what is fit for children.

Id. at 383.

The context of these cases is admittedly not an exact fit. Our case does not involve a criminal prohibition, but only a refusal to accept advertising. The context in Denver Area Educucational Telecommunications Consortium is closest: there the issue was the FCC's ability to control certain sexually explicit

-42-

content on cable television. 518 U.S. at 734-36. In both <u>Denver Area</u> and the other cases, the question was whether statutes or regulations had been drafted narrowly enough. Our focus is particular decisions to exclude advertisements, not the facial validity of the guideline. Finally, all of these cases involved the regulation of sexually explicit (but non-obscene) speech; sexual speech is not involved in this case. Still, these differences do not weaken the general principle that a purported justification for excluding speech to adults on the grounds of protecting children will be examined closely to see if the decisions reasonably do protect children.

There are various situations which will lead a court to conclude that, despite the seemingly neutral justifications offered by the government, nonetheless the decision to exclude speech is a form of impermissible discrimination. Three are relevant here. First, statements by government officials on the reasons for an action can indicate an improper motive. <u>See, e.g.</u>, <u>Vill. of Arlington Heights</u> v. <u>Metro. Housing Dev. Corp.</u>, 429 U.S. 252, 268 (1977). Second, where the government states that it rejects something because of a certain characteristic, but other things possessing the same characteristic are accepted,[8] this sort of

_____

[8]For comparison purposes, it is important to be clear that the MBTA guidelines also preclude advertisements containing speech about "candidate[s] for public office" or about "specific ballot question[s], initiative petition[s], or referend[a]." The MBTA has rightly not relied on this guideline in our case, because Change

-43-

underinclusiveness raises a suspicion that the stated neutral ground for action is meant to shield an impermissible motive. See, e.g., Cornelius, 473 U.S. at 812; AIDS Action, 42 F.3d at 10-12 (where MBTA claimed to be excluding condom-promotion advertisements because they were sexually explicit and patently offensive, but MBTA allowed other sorts of sexually explicit advertisements, such as movie advertisements, "unrebutted appearance of viewpoint discrimination" is found). Third, suspicion arises where the viewpoint-neutral ground is not actually served very well by the specific governmental action at issue; where, in other words, the fit between means and ends is loose or nonexistent. This situation comes up in a variety of legal settings. See, e.g., Purkett v. Elem, 514 U.S. 765, 768 (1995) (judges may sometimes find pretext in race-based equal protection challenge to peremptory strikes where prosecutor's justifications for challenges are "implausible or fantastic"); Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 259 (1981) (employer's misjudgments of the qualifications of job applicants may be relevant to whether the employer's neutral, merit-based reasons for hiring are pretexts for discrimination under Title VII). All three factors lead us to conclude that the reasons given by the MBTA in this case are insufficient to avoid a conclusion of viewpoint discrimination.

---

the Climate's advertisements do not fall into these two narrow categories.

Inherent in the MBTA's position is its recognition that save for the risk of inducing juveniles to smoke marijuana, the refusal to run these advertisements for an adult audience would be viewpoint discrimination. That conclusion is essentially conceded in the MBTA's briefs. We find the purported justification of protecting children to be undermined for two basic reasons. First, there is direct evidence, through statements by MBTA officials, that the reason for rejecting the advertisements was actually distaste for Change the Climate's viewpoint. Second, there is evidence that the MBTA's rejection of these advertisements does not actually serve the alleged purpose of protecting children, and so the MBTA cannot offset the direct evidence against it.

The MBTA's initial statement of reasons for rejecting the three ads was, in part, that the ads were part of Change the Climate's effort to "reform marijuana [laws]" in an "effort to legalize."[9] This was a direct statement of viewpoint discrimination. It was reinforced by later evidence under the 2003 guidelines. The MBTA General Manager said he would publish the Mother and Police Ads if they came to the opposite conclusion -- one with which he agreed -- expressing viewpoints which reinforced compliance with, but did not question, existing laws.

_____

[9]These comments were made by Lucy Shorter, then Director of Marketing for the MBTA and the liaison between the MBTA and its advertising contractor.

Supporting the direct evidence is our conclusion that the MBTA's rejection of these advertisements does not reasonably serve its purported justification. Dealing first with the Mother Ad and the Police Ad, it is clear that they are not targeted at children, nor can they reasonably be construed to promote illegal marijuana use among juveniles. The ads do not advocate illegal drug use. Rather, these two ads make a sophisticated argument that the criminalization of marijuana imposes worse consequences on society than would alternatives. The risk posed by the Mother Ad and Police Ad of inducing juveniles to engage in illegal marijuana activity is remarkably minimal and, indeed, probably nonexistent. The MBTA is certainly correct to evaluate individually each ad as to its compliance with the guidelines. Its judgments must be reasonable and it would not be reasonable to think that juveniles were exposed to no other information about drugs. Indeed, the MBTA has itself a long history of running ads stressing that drug use is illegal and that drug laws should be obeyed.

The MBTA has sought to allay any suspicions of viewpoint discrimination by representing that it would run advertisements saying in bold text that the drug laws should be changed, provided the ads at the same time acknowledge that marijuana use is illegal. This, it says, removes any concern about viewpoint discrimination because it proves that the same message could be run if a different manner of expression were used. But that is not so. The MBTA's

concession means simply that it will run advertisements which do not attract attention but will exercise its veto power over advertisements which are designed to be effective in delivering a message. Viewpoint discrimination concerns arise when the government intentionally tilts the playing field for speech; reducing the effectiveness of a message, as opposed to repressing it entirely, thus may be an alternative form of viewpoint discrimination. See R.A.V., 505 U.S. at 392 (It is viewpoint discriminatory for the government to "license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules."); see also Cohen v. California, 403 U.S. 15, 26 (1971) (the emotive impact of a particular means of expression is often more important than the underlying cognitive impact of a message, and this emotive impact is also protected by the Constitution).

This suspicion of viewpoint discrimination is deepened by the fact that the MBTA has run a number of ads promoting alcohol that are clearly more appealing to juveniles than the ads here. It is true that there is a distinction: alcohol, like marijuana, cannot legally be sold to minors but can be sold to adults, and marijuana may not, in general, legally be used by either adults or minors. That cannot be the dividing line if the argument is that the MBTA is trying to avoid inducing illegal conduct: the MBTA has

correctly not defended on the basis that the ads will induce illegal marijuana use by adults.

The more difficult issue concerns the first advertisement -- the Teen Ad. It certainly may reasonably be viewed as directed to attract the attention of teenagers. What is far more questionable is the reasonableness of the contention that the ad would induce teenagers to smoke marijuana. The ad itself says nothing of the sort. Indeed, it says the opposite -- that "smoking pot is not cool." The ad then implies that marijuana should not be seen as equivalent to heroin or cocaine. The clearest message is that marijuana usage should be decriminalized, while heroin and cocaine usage should remain criminal. The targeting of teenagers does not remove the ad from the realm of political speech. Many of those who are teenagers are either voters or will soon be voters, and the ad is also aimed at adults. The MBTA cannot put a thumb on the scale to preclude Change the Climate from effectively communicating a message about changing the laws to a likely responsive group of voters.

The MBTA's own evidence fails to support its argument. Headmaster Kelley's point was not that the Teen Ad would induce drug use, but the rather different point that the Ad presented a "mixed message." The mixed nature of the message was about which drugs were legal and which were not; thus her concern was that the ad would promote confusion about whether marijuana use was illegal.

The MBTA's conclusion, however, requires an additional step -- that the ads would not only confuse teenagers about marijuana's illegal status, but that this confusion would then lead teenagers to smoke marijuana. Neither step in the reasoning is supported by the record.

The Teen Ad must be evaluated in context. The MBTA has run numerous ads that discourage drug use and encourage respect for and adherence to the current drug laws. Some of these ads are sponsored by government agencies, such as the Office of National Drug Control Policy, whose goal is to further the current drug laws and aid in their enforcement. Juveniles are exposed frequently to anti-drug messages in a variety of settings,[10] including in schools. Indeed, schools may be the very place where students, in class, debate the wisdom of certain laws, as at Boston Latin. That this one at best ambiguous advertisement would lead teenagers to believe that marijuana is legal, against a barrage of contrary information, is unlikely. Yet the MBTA's argument requires even a further step. That one advertisement, which on its face says use of marijuana is "not cool," would actually induce juveniles to smoke marijuana strikes us as thin to the point of implausibility. The MBTA's

---

[10]For example, the White House reported that the fiscal year 2003 budget included $149 million for a National Youth Anti-Drug Media campaign, meant to prevent drug use by teens. See National Drug Control Strategy: FY 2005 Budget Summary 90 (March 2004), available at http://www.whitehousedrugpolicy.gov/ publications/policy/budgetsum04/budgetsum05.pdf.

justifications for not running these advertisements are sufficiently implausible that on the totality of the evidence we conclude that the MBTA has engaged in viewpoint discrimination.

Moreover, the rejection of the three ads would fail to pass muster under the other prong of analysis laid out in Cornelius, which requires that any restriction be reasonable in light of the purpose of the forum, because their rejection is, in context, unreasonable. Cornelius, 473 U.S. at 806; see also Perry Educ. Ass'n, 460 U.S. at 49-54 ("The touchstone for evaluating [] distinctions [in a non-public forum] is whether they are reasonable in light of the purpose which the forum at issue serves."). The reasonableness standard is not a particularly high hurdle; there can be more than one reasonable decision, and an action need not be the most reasonable decision possible in order to be reasonable. Cornelius, 473 U.S. at 808. Still, the MBTA's judgment that these advertisements will foster illegal activity by minors is, in context, entirely unreasonable. See Kokinda, 497 U.S. at 734; Huminski v. Corsones, 386 F.3d 116, 155 (2d Cir. 2004) (finding particular restriction on speech in non-public forum unreasonable). The reasons stated above, which show the lack of fit between the rejection of these three advertisements and the protection of children, are sufficient for our conclusion.

We reverse the judgment of the district court as to all three advertisements proposed by Change the Climate, and direct

entry of declaratory judgment that the rejection of these advertisements violated the First Amendment. At this point, there is no reason to think that injunctive relief is also required.

B.   Ridley: Viewpoint Discrimination and Unreasonableness

Unlike in Change the Climate, we conclude that the MBTA has not engaged in viewpoint discrimination in Ridley, either in the facial validity of its guidelines or the guidelines as applied to Ridley's advertisement. The guidelines prohibiting demeaning or disparaging ads are themselves viewpoint neutral. That is also true of the application of the guidelines to Ridley's ad on the facts here.

As to the guideline itself, we note that the 2003 revision to the guidelines continued to prohibit demeaning or disparaging ads, but did so in more general terms, not tied only to certain categories such as race, religion, and gender. Most likely that revision was made in light of R.A.V., 505 U.S. at 392, and later case law.[11] The current regulation simply prohibits the use

---

[11]The MBTA's two earlier policies, in their singling out of certain specific groups, could, dubitante, be thought to be like the hate speech law at issue in R.A.V., which banned the placing of certain symbols or objects on property when "one knows or has reasonable grounds to know [that such placement] arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender." R.A.V., 505 U.S. at 380. In dicta, the Court noted:

> In its practical operation . . . the ordinance goes even beyond mere content discrimination to actual viewpoint discrimination. Displays containing some words--odious racial epithets,

of advertisements that "demean[] or disparage[] an individual or group of individuals," without listing any particular protected

_____

> for example--would be prohibited to proponents of all views. But "fighting words" that do not themselves invoke race, color, creed, religion, or gender--aspersions upon a person's mother, for example--would seemingly be usable _ad libitum_ in the placards of those arguing _in favor_ of racial, color, etc., tolerance and equality, but could not be used by those speakers' opponents. One could hold up a sign saying . . . that all "anti-Catholic bigots" are misbegotten; but not that all "papists" are, for that would insult and provoke violence "on the basis of religion." St. Paul has no such authority to license one side of a debate to fight freestyle, while requiring the other to follow Marquis of Queensberry rules.

Id. at 391-92.

The ability to use certain linguistic tools in the course of argument, in other words, cannot in certain settings be statutorily monopolized by only one side of a debate, even if the other side had other, possibly less effective, ways to get its message out. Under the MBTA's first and second guidelines, as in the statute in R.A.V., this sort of tilted playing field would potentially have been possible. The criminal statute at issue in R.A.V. and the regulation of advertising by the government as a commercial enterprise at issue are quite different contexts, and thus R.A.V. may have no applicability here.

Further, the type of problem identified in R.A.V. is not a problem for an advertiser in Good News's position. Good News is a religion; its rejected advertisement was fairly understood as an attempt to demean other religions. Any attempt to demean Good News or its stance on the falsity of other religions would doubtlessly be denigration "on the basis of . . . religion" and thus would be prohibited even by the initial two sets of regulations. The R.A.V. problem only exists where the individual or group that is prevented from speaking is not itself an object of protection under the classifications given in a statute or regulation (for example, bigots were not a protected group under the statute in R.A.V.).

Ridley also cannot challenge these earlier regulations on their face, as part of an overbreadth challenge. Such a challenge was not made to us, and it is waived.

groups.  In this context, the guideline is just a ground rule: there is no viewpoint discrimination in the guideline because the state is not attempting to give one group an advantage over another in the marketplace of ideas.  See Elena Kagan, "Regulation of Hate Speech and Pornography after R.A.V.," 60 U. Chi. L. Rev. 873, 889 (1993) (suggesting, based on the court's language, that the problem with the statute in R.A.V. could have been avoided by drafting a statute that did not single out any specific groups for protected status).[12]

Similarly, under the MBTA's current guideline, all advertisers on all sides of all questions are allowed to positively promote their own perspective and even to criticize other positions so long as they do not use demeaning speech in their attacks.  No advertiser can use demeaning speech:  atheists cannot use disparaging language to describe the beliefs of Christians, nor can Christians use disparaging language to describe the beliefs of atheists.  Both sides, however, can use positive language to describe their own organizations, beliefs, and values.  Some kinds

---

[12]This guideline at issue here is somewhat like the regulation at issue in Cogswell v. City of Seattle, 347 F.3d 809 (9th Cir. 2003).  In Cogswell, the plaintiff challenged a regulation that allowed each candidate to promote herself in a city-printed "voters' pamphlet," but forbade a candidate from discussing her opponents in the pamphlet.  The court upheld this regulation as a content restriction that did not lead to viewpoint discrimination: such a "ground rule" that is "equally applicable to all candidates" did not create a tilted playing field for speech.  Id. at 816.

of content (demeaning and disparaging remarks) are being disfavored, but no viewpoint is being preferred over another. The "reasonable person" referenced in the MBTA's guidelines of course does not belong to any particular religious group, and would protect minority, as well as majority, religious beliefs from language that would "demean or disparage" them. The MBTA's current guideline neither intends nor has as a significant effect the tilting of the playing field for speech.

Ridley argues that because the MBTA accepted the first two ads it must accept the third. We reject the argument that because a government commercial enterprise has opened up discussion on one particular "topic" (say, religion), it must allow any and all discussion on that topic. Reasonable ground rules, so long as they are not intended to give one side an advantage over another, can be set without falling prey to viewpoint discrimination. It is possible that the effect of these guidelines will fall more heavily on some messages than others in certain contexts, but this does not itself make the guidelines viewpoint discriminatory; the intent and chief impact of the non-demeaning requirement is merely to ensure a certain minimum level of discourse that is applicable to everyone.

The MBTA could reasonably conclude that the earlier two advertisements did not demean or disparage other religions, but that the third advertisement did. The first ad questioned the

waywardness of today's Christians; the second issued a condemnation of other religions. By contrast, the third advertisement went a vitriolic further step and directly demeaned a number of religions, by calling them false. It told the adherents of those religions that their ways are ungodly, they are "going to hell." In addition, those demeaned religions are likely to be the shared religions of a number of the MBTA riders. That the MBTA chose not to ban the earlier two ads (the first under threat of suit) does not mean it was required to accept the third ad. This is true even had the MBTA made a mistake under its guidelines in accepting the first two ads.

Ridley argues that even if the third advertisement is demeaning to other religions, the government still may not reject the ad because the subject matter is the protected one of religion. The government may not, Ridley argues, "attempt to protect citizens from being exposed to religious views they might find offensive," citing Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495 (1952), which invalidated a statute that set up a censorship board which refused licenses for "sacrilegious" films. The case is inapposite, as the MBTA is not censoring religious speech here at all. The statute in Wilson acted as a prior restraint preventing the showing of a film deemed sacrilegious by the censors in any public place in the state. Id. at 497, 503. The guidelines at issue here merely prevent advertisements from being put up in the MBTA's own system.

-55-

Moreover, the statute in Wilson was aimed only at religious speech, and the language made it clear that its goal was to "suppress real or imagined attacks on a particular religious doctrine." Id. at 505. The goal of the MBTA's guidelines here has nothing to do with censoring religious beliefs; the purpose instead is to maintain a certain minimal level of decorum in all advertisements.

The second advertisement and the third advertisement share the same basic viewpoint, yet the MBTA approved the second advertisement even though it rejected the third. This is further evidence that the MBTA's actions here were not motivated by distaste for Ridley's particular viewpoint. She has presented no evidence that the MBTA ever allowed any other specific advertisement that would suggest viewpoint discrimination towards her. For example, there is no evidence in the record that other advertisements, religious or otherwise, were accepted despite containing demeaning or disparaging content.

The two-week delay in approving Ridley's first advertisement is surely not a basis for inferring viewpoint discrimination. Nor is the saga connected with the placement of her second advertisement -- this shows merely that the MBTA was honing its guidelines throughout this period and was working out its enforcement of various issues connected with the guidelines.[13]

---

[13]It is true, as the parties stipulated, that the word "denigration" in the MBTA's first set of guidelines, under which

While the MBTA's guideline and decision to reject Ridley's advertisement are viewpoint neutral, the regulatory scheme still must be "reasonable in light of the purpose served by the forum" in order to be upheld. <u>Cornelius</u>, 473 U.S. at 806. The regulatory scheme at issue here is eminently reasonable. The MBTA's stated purposes in running its advertising program include "maximiz[ing] revenue" by making money through advertisements while not reducing ridership through offensive advertisements, "maintaining a safe and welcoming environment" for its riders (including children), and avoiding its identification with the ads it displays. A guideline preventing demeaning or disparaging advertisements is likely to serve these purposes well and is consistent with the MBTA's own "Courtesy Counts" program.

C. <u>Facial Validity of Guidelines: Vagueness and Vesting of Discretion</u>

Change the Climate argues that the guidelines must fail, in any event, because they are not sufficiently clear and objective. Change the Climate and Ridley also challenge the

---

Ridley's second advertisement was initially rejected, means virtually the same thing as the words "demean[] or disparage[]" in the MBTA's second set of guidelines, under which Ridley's second advertisement was eventually accepted. But the second set of guidelines also adopted a new policy determining that a website listed on an advertisement should not be considered unless the advertisement itself has an unclear message. This new policy was directly applicable to Ridley's second advertisement, which referenced a website containing additional and potentially "demeaning" content (the same kind of list of "false" religions stated in the third advertisement).

regulatory scheme on the ground that it is too vague and vests too much discretion in MBTA officials. In its Ridley opinion, the district court did not address the claim. In Change the Climate, however, the district court found that the guideline prohibiting demeaning or disparaging material was "somewhat vague" on its face and "still leaves too much room for arbitrary decisions."

In any event, the record is adequate to address this kind of facial challenge to the guidelines. Since, as well, the parties have thoroughly briefed this issue, there are no facts in dispute, and the issue raises important questions regarding the application of the First Amendment to the MBTA, we will address this challenge. See, e.g., In re Keeper of Records, 348 F.3d 16, 26 (1st Cir. 2003) (appellate consideration of an issue raised but not ruled upon by the court below is proper where "[t]he parties have briefed [an] issue, the facts pertaining to it are essentially uncontradicted, and an adjudication will expedite matters."); AIDS Action Comm. of Massachusetts v. MBTA, 42 F.3d 1, 7 (1st Cir. 1994) ("[S]o long as the record is adequately developed, we will not hesitate to resolve a mixed fact/law issue involving a core First Amendment concern even though the district court did not address it in the first instance.").

The vagueness inquiry, to the extent it applies here at all, incorporates two basic concerns: 1) concerns about fair notice, and about the related danger of chilling expression, and 2)

-58-

concerns about excessive discretion being invested in administering and enforcing officials.  See Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972).  The mere fact that a regulation requires interpretation does not make it vague.  McConnell v. FEC, 540 U.S. 93, 169 n.64 (2003); Rose v. Locke, 423 U.S. 48, 49-50 (1975).

First Amendment analysis is particularly prone to words and phrases being taken out of context.  Concerns about vagueness and about excessive discretion arise most strongly in other contexts.  The void-for-vagueness argument classically arises where the government imposes criminal sanctions for conduct or speech.  See United States v. Lachman, 387 F.3d 42, 56-59 (1st Cir. 2004).  And the concern over subjective decision making has most effect in government licensing schemes.  Neither is the situation here.

Here, there is no serious concern about either notice or chilling effects, where there are no consequences for submitting a non-conforming advertisement and having it rejected.  See Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 588-89 (1998) (no serious concern that people will "steer too far clear" and be chilled in the context of a regulation that is not criminal or quasi-criminal and merely establishes criteria for grants); Children of the Rosary v. City of Phoenix, 154 F.3d 972, 983 (9th Cir. 1998) (relaxing the vagueness standard in the context of a city transportation system's advertising policy because "[t]his

claim is unlike the usual vagueness challenge involving a fine or other sanction that has the potential to chill conduct.").

Thus the inquiry reduces to an investigation into whether the discretion given to MBTA administrators under the scheme is unconstitutionally excessive. The void-for-vagueness doctrine and the excessive delegation doctrine are technically "analytically distinct," Griffin v. Sec'y of Veterans Affairs, 288 F.3d 1309, 1329 (Fed. Cir. 2002), but overlap on the facts here. Virtually all of the Supreme Court cases to determine excessive discretion challenges have dealt with traditional public fora. See Griffin, 288 F.3d at 1321-22. The danger of excessive discretion in this case is that it could lead to viewpoint-discriminatory decisions in practice even under a facially neutral regulation. We have already concluded there was no viewpoint discrimination in Ridley, and that the viewpoint discrimination in Change the Climate did not result from the face of those guidelines.

The cases that Change the Climate and Ridley cite all deal with licensing schemes regulating the exercise of speech in traditional public fora. The dissent similarly relies on cases and standards that are out of context because they deal with traditional public fora. See, e.g., Forsyth County, Ga. v. Nationalist Movement, 505 U.S. 123, 130-33 (1992) (striking down permit scheme for demonstration on courthouse steps); Shuttlesworth v. City of Birmingham, Ala., 394 U.S. 147, 150-51 (1969) (striking

-60-

down permit requirement for protest on city streets).  In these situations, it is true, delegations of authority to grant licenses for speech may operate as prior restraints.  As such, those delegations must meet the stringent standard of containing "narrow, objective, and definite standards to guide the licensing authority."  Shuttlesworth, 394 U.S. at 150-51.  The settings for those cases are unarguably public fora open to everybody and to all types of speech; the very limited obstructions permitted by the licensing requirement are allowed primarily so that the state can maintain basic order.

The regulatory scheme at issue here is not a licensing scheme, and the MBTA advertising program is neither a traditional nor a designated public forum.  See, e.g., Kokinda, 497 U.S. at 725 (government holds as proprietor, and not as licensor, when operating a non-public forum). Excessive discretion and vagueness inquiries under the First Amendment are not static inquiries, impervious to context.  See Reno v. ACLU, 521 U.S. 844, 871-72 (1997) (the vagueness inquiry is most rigorous in a criminal context, where there is a high risk speech will be chilled); Finley, 524 U.S. at 581-83, 588-89 (requirements that might be vague in other contexts, like a criminal statute, were not vague when used as criteria for a grant process that was subjective by nature); Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498 (1982)("The degree of vagueness that the

Constitution tolerates--as well as the relative importance of fair notice and fair enforcement--depends in part on the nature of the enactment.").

Our view is that a grant of discretion to exercise judgment in a non-public forum must be upheld so long as it is "reasonable in light of the characteristic nature and function" of that forum. Griffin, 288 F.3d at 1323; see also Finley, 524 U.S. at 589-590 (approving broad discretion to take into consideration "general standards of decency and respect for the diverse beliefs and values of the American public" in NEA grant process, given the inherently subjective nature of these types of selection processes). "[S]electivity" and "discretionary access" are defining characteristics of non-public fora, which unlike public fora are not intended to be open to all speech. See Griffin, 288 F.3d at 1323.

The MBTA's regulatory guidelines, which in Ridley reject any advertisement that "demeans or disparages an individual or group of individuals" and which use "prevailing community standards" to determine whether advertisements fall afoul of this standard, are not unreasonably vague or overbroad, given the nature of the MBTA's advertising program and its chief purpose of raising revenue without losing ridership. Some kinds of advertisements that will be consistent with this purpose may be difficult to pinpoint with exact precision; some degree of interpretation, and

some reliance on concepts like "prevailing community standards," is inevitable. In Griffin, the court found that considerable discretion left in the hands of the Department of Veterans Affairs was acceptable to ensure the preservation of the commemorative functions of national cemeteries; the MBTA is also entitled to some discretion in determining which advertisements are likely to alienate ridership and cost it revenue. These decisions also "may defy objective description and . . . vary with individual circumstances." Griffin, 288 F.3d at 1325.

In any event, for purposes of the acceptance or rejection of advertising, words like "demean" or "disparage" have reasonably clear meanings. We recognize that several courts have struck down, on vagueness grounds, school speech codes that incorporated somewhat similar terms. See Dambrot v. Central Mich. Univ., 55 F.3d 1177, 1183-84 (6th Cir. 1995); UWM Post, Inc. v. Board of Regents of the Univ. of Wis. Sys., 774 F. Supp. 1163, 1178-81 (E.D. Wis. 1991); Doe v. Univ. of Mich., 721 F. Supp. 852, 866-67 (E.D. Mich. 1989). But cf. UWM Post, 774 F. Supp. at 1179-80 (In the context of a university hate speech regulation, the word "demean" is not "unduly vague," since it has a "reasonably clear" meaning: "to debase in dignity or stature.").[14] These decisions come out of

_____

[14]The changes in position by the MBTA in this case do not show that the standard is too vague. We decline to use the MBTA's past changes in its guidelines against it; what is important is that the MBTA's rules are now reasonably clear.

a very different context: vagueness concerns are more pressing when there are sanctions (such as expulsion) attached to violations of a challenged regulation.

Further, we acknowledge that two courts considered public transportation advertising policies that gave their systems discretion to reject "controversial" advertisements to be unconstitutional. See United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth., 163 F.3d 341, 358-60 (6th Cir. 1998); Nat'l Abortion Fed'n v. Metro. Atlanta Rapid Transit Auth., 112 F. Supp.2d 1320, 1327-28 (N.D. Ga. 2000). The cases are distinguishable. In both, a public forum was found. Further, a regulation asking whether something is "controversial" is a less precise inquiry, and has the potential to strike down many more advertisements, than a regulation asking whether advertisements "demean[] or disparage[]" someone.

**III.**

Attorney's Fees

Change the Climate appealed from the district court's denial of attorney's fees. Change the Climate argued it was entitled to attorney's fees on the findings that the guidelines were constitutionally flawed. The basis for the argument is now gone, as we uphold the guidelines against any facial challenge.

Nonetheless, Change the Climate's viewpoint discrimination argument has prevailed. See 42 U.S.C. § 1988. We

-64-

remand to the district court for further proceedings on attorney's fees.

## IV.

Conclusion

The decision of the district court in the Ridley case granting judgment to the MBTA on the ground there was no viewpoint discrimination is **affirmed**.  The decision in Ridley, which was entered in the district court's Change the Climate judgment, is **reversed** as to the finding that the "demeaning or disparaging" guideline is constitutionally flawed and as to the retention of jurisdiction over this issue.  Entry of declaratory judgment is awarded to the MBTA as to the facial validity of the sets of guidelines at issue in both Ridley and Change the Climate.  The district court's decision in Change the Climate on viewpoint discrimination grounds is **reversed** with directions to enter declaratory judgment for Change the Climate on those grounds.  We **remand** to the district court for entry of judgment consistent with this opinion and for determination of the issue of attorney's fees for Change the Climate.  Since each side has prevailed on portions of this case, no costs are awarded.

**(Concurring and dissenting opinion follows.)**

**TORRUELLA**, <u>Circuit Judge</u> **(Concurring in part, Dissenting in part)**. Since the majority agrees with me in Case No. 03-2285 ("<u>Change the Climate</u>") that the MBTA engaged in unconstitutional viewpoint discrimination by rejecting all three of Change the Climate's advertisements, it is appropriate that I concur in the outcome of that appeal. Unfortunately, I can neither join the opinion of my learned colleagues on the remainder of its analysis, nor join in the outcome of Case No. 03-1970 ("<u>Ridley</u>"). In my view, regardless of the nature of the forum involved, the MBTA's rejection of Ridley's third proposed advertisement was unreasonable and constitutes viewpoint discrimination, abuses made possible by the vague and subjective nature of the MBTA's "demean[ing] or disparag[ing]" standard. Consequently, it is unnecessary for this court to forge into the murky waters of forum analysis -- an issue, it is worth noting, irrelevant to the outcome in <u>Change the Climate</u> and not even raised by the plaintiff in <u>Ridley</u>. See <u>AIDS Action Comm. of Mass., Inc.</u> v. <u>Mass. Bay Transp. Auth.</u>, 42 F.3d 1, 12 (1st Cir. 1994) (finding forum analysis unnecessary when restriction violates prohibition on viewpoint discrimination, and undesirable on a record not fully developed by plaintiff-appellant); <u>see also</u> Laurence H. Tribe, <u>American Constitutional Law</u> § 12-24, at 988 (2d ed. 1988) (deeming "public forum classifications . . . unnecessary

and unhelpful" in challenges to content-based restrictions).[1]  If, however, the nature of the forum created by the MBTA's opening its facilities to commercial and non-commercial advertisers must be decided, we cannot allow ourselves to be led astray by the MBTA's hollow protestations that it did not intend to open its facilities to free expression.  Accordingly, I would find that the MBTA has created a public forum for the expression of ideas such as those contained in Ridley's third advertisement.

## I.  <u>Rejection of Ridley's advertisement</u>

I need not repeat much of the background already provided by the majority.  Suffice it to say, the offending guideline allows the MBTA to refuse any advertisement that "contains material that demeans or disparages an individual or group of individuals."  The guideline states that the MBTA will determine whether the advertising contains such offending language by reference to "whether a reasonably prudent person, knowledgeable of the MBTA's ridership and using prevailing community standards, would believe

---

[1]Indeed, the majority's insistence on delving into forum analysis is perplexing, given its recognition that "[p]ublic forum analysis itself has been criticized as unhelpful in many contexts, and particularly this one where the government is operating a commercial enterprise earning income from advertising."  Maj. op. at 15-16 (<u>citing</u> Tribe, <u>supra</u>, at § 2-24, at 922 ("[W]hether or not a given place is deemed a 'public forum' is ordinarily less significant than the nature of the speech restriction--despite the Court's rhetoric.");  Frederick Schauer, <u>Principles, Institutions, and the First Amendment</u>, 112 Harv. L. Rev. 84, 97 (1998) ("Of all of the paths down which the Court might go in dealing with the government enterprise cases, the so-called 'forum doctrine' appears least satisfactory.")).

that the advertisement contains material that ridicules or mocks, is abusive or hostile to, or debases the dignity or stature of, an individual or group of individuals."

Regardless of how the MBTA's forum should be classified, the MBTA's content-based restrictions must (1) be "reasonable in light of the purpose served by the forum," Cornelius v. NAACP Legal Def. & Educ. Fund, 473 U.S. 788, 806 (1985), (2) not discriminate on the basis of viewpoint, see id. at 800 ("Access to a non-public forum . . . can be restricted as long as the restrictions are 'reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" (quoting Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 46 (1983)), and (3) not be so vague as to lead to arbitrary or discriminatory application, see, e.g., Grayned v. City of Rockford, 408 U.S. 104, 108 (1972) ("[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them."). See also AIDS Action, 42 F.3d at 13 ("[The MBTA] will, at the least, need to act according to neutral standards, and it will need to apply these standards in such a way that there is no appearance that 'the [government] is seeking to handicap the expression of particular ideas.'" (quoting R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 394 (1992)). The MBTA's rejection of Ridley's proposed advertisement fails on all of these points.

As indicated in appellant's brief, the "prevailing community standards" language contained in the offending MBTA rule is the MBTA's attempt to breathe validity into its regulation by interjecting one prong of the three-prong test in <u>Miller</u> v. <u>California</u>, 413 U.S. 15, 24 (1973), for determining whether speech is obscene. One out of three prongs, however, is insufficient to cure the guideline's defect. "Just because a definition including three limitations is not vague, it does not follow that one of those limitations, standing by itself, is not vague." <u>Reno</u> v. <u>ACLU</u>, 521 U.S. 844, 873 (1997) (holding that the Communications Decency Act, which used a "contemporary community standards" test to regulate obscene speech on the Internet, offended the First Amendment because it was unconstitutionally vague).

Indeed, the very idea that the MBTA considers that there is such a thing as a "prevailing community standard" for demeaning or disparaging expression is itself ridiculous. How would such a rule be discerned? What evidence is there in the record that the third advertisement violated this standard, other than the MBTA's subjective and conclusory assertion that it did? To the contrary, a religious message such as the advertisement in question does not disparage its targets, but rather alerts them to a (perceived) fact concerning their eternal salvation.[2] This is not a case of a hate

---

[2]In this way, Ridley's advertisement would be analogous to a public service announcement stating: "Kids who smoke think they look cool, but really it makes them look stupid." It would be

group defaming the followers of Judaism, Catholicism, or another religion as having some intrinsic individual flaw. Rather, Ridley's advertisement attempts to convert these people to her religion. Telling people they are risking going to hell is, like it or not, a key component of explaining why religious choices are so important, and reasonable minds could most certainly disagree with the conclusion that such a statement in any way demeans or disparages the very people it aims to save. That such a statement was considered "hostile," "mock[ing]," or "demean[ing]" highlights the ambiguity and unreasonableness of the MBTA's guideline. The "prevailing community standard" formulation does not rescue the MBTA's guideline from vagueness; rather, it permits MBTA authorities -- even if they have the best of intentions -- to make subjective, ad hoc determinations about speech that appears controversial because it endorses a minority viewpoint. Cf. Keyishian v. Bd. of Regents, 385 U.S. 589, 603 (1967) (stating that the First Amendment protects against an oppressive "pall of orthodoxy" in schools). The guideline, therefore, is void for vagueness.[3]

difficult to imagine the MBTA rejecting such an advertisement on the basis that it ridicules or demeans adolescent smokers.

[3]The majority's suggestion, Maj. op. at 59-62, that the vagueness inquiry is not important in this case because it does not involve a licensing scheme in a traditional public forum is unconvincing. Even if the majority is correct that this is not a traditional public forum in the legal sense, the MBTA transit system serves as its functional equivalent in today's society. 2.5

The MBTA has permitted religious advertising in its facilities, but discriminates among religious messages on the basis of their content. The majority claims that this content discrimination does not amount to viewpoint discrimination because all religions "are allowed to positively promote their own perspective and even to criticize other positions so long as they do not use demeaning speech in their attacks." Maj. op. at 54. This conclusion assumes that a statement like "all good Catholics go to heaven" is sufficiently rebutted by replying "all good Buddhists go to heaven." From this dialogue, we could draw the heartwarming conclusion that "all good Catholics and Buddhists" go to heaven. Good or bad, however, this is simply not the type of message that most religions espouse. Especially for small groups like Ridley's, an essential part of proselytizing is explaining that in their view and the view of their prophet, "all good Catholics, Buddhists, etc. are not going to heaven; rather, they are going to hell." This belief is central to their message of

_____

million people use its facilities on a daily basis, and it contains approximately 40,000 advertising spaces. In effect, the MBTA is in a position to control the dissemination of information to a large segment of the public which, in a practical sense, is obliged to be exposed to whatever advertising the MBTA chooses to permit in its facilities. Consequently, the "danger of excessive discretion . . . lead[ing] to viewpoint-discriminatory decisions," id. at 60, is quite serious. Further, while the majority indicates that concern about vagueness is at its zenith in licensing schemes for traditional public fora, I am aware of no precedent that would permit vagueness in regulations outside of this context, especially when the potential ramifications of unconstitutional implementation have a similar practical effect.

conversion. It is the clearest statement of the (eternal) consequences for those who do not convert, and it is undoubtedly a fact that they are hoping will propel the message's viewers to go to their website and learn more about their beliefs.

Further, while the majority concludes that an advertisement may criticize other religions as long as it does so in a non-demeaning way, it is apparent from the rejection of Ridley's third advertisement that even a text-based criticism about religion[4] will be more likely to strike MBTA authorities as "hostile," "mocking," or "demeaning," simply because it names that religion. Indeed, the third advertisement did not say anything that was not implicit in the second advertisement, which declared that there were over 1,000 (unnamed) false religions. If the guidelines permit the second advertisement, they cannot reasonably

---

[4]The rejected advertisement stated that "[t]here are no scriptures in the Bible that teach that God set up the Catholic religion, the Baptist religion, the Pentecostal religion, the Jehovah's Witness religion or the Muslim religion. These religions are false."

be applied to forbid the third.[5]  Thus, the MBTA's position is intrinsically viewpoint oriented.

The religious nature of Ridley's advertisement increases the MBTA's burden, for religious advertising is a "form of religious activity [that] occupies the same high estate under the First Amendment as do worship in the churches and preaching from the pulpits." Murdock v. Pennsylvania, 319 U.S. 105, 109 (1943); see also Jews for Jesus, Inc. v. Mass. Bay Transp. Auth., 984 F.2d 1319, 1324 (1st Cir. 1993) (prohibiting ban on religious leafletting at MBTA stations).  "The principle that government may not enact laws that suppress religious belief or practice [merely because it is unorthodox] is so well understood that few violations are recorded in our opinions." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 523 (1993) (striking down attempted suppression of religious rites that included animal sacrifices).

Simply put, the First Amendment does not recognize state authority to regulate religious expression merely because it might

---

[5]The majority insists that MBTA ought not be bound to permit expressions analogous to those it mistakenly permitted in the past. This might be so in an isolated case.  However, one cannot ignore the MBTA's haphazard and unpredictable pattern of enforcement with regard not only to Ridley's three ads, but also to earlier ads, such as those at issue in AIDS Action, 42 F.3d at 1.  This suggests that it was no mere oversight or misunderstanding that led to the acceptance of Ridley's second advertisement.  We must not allow the MBTA to change its standards or its enforcement thereof every time its application of the guidelines is challenged.

offend other persons.  "It is firmly settled that . . . the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers."  Hustler Magazine v. Falwell, 485 U.S. 46, 56 (1988) (quoting Street v. New York, 394 U.S. 576, 592 (1969)).  Religious speech -- especially that of a proselytizing nature most often found in mass advertising by religious organizations -- is intended to strike at the core of people's strongest beliefs; in that sense, it is inevitably "hostile" to those beliefs.  Placing the government in a position of deciding whether to allow the expression of those beliefs depending on whether they are "hostile" or "demeaning"  to the community strikes at the heart of the First Amendment's prohibitions against state regulation of speech. Texas v. Johnson, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").  Any religious speech will be viewed as "hostile" by at least some, if not all, of those who do not share the belief it proclaims. See Gitlow v. New York, 268 U.S. 652, 673 (Holmes, J., dissenting) ("Every idea is an incitement.").

Religious belief is quintessentially a matter of viewpoint.  The government cannot allow dissemination of one viewpoint that it finds inoffensive or bland, and prohibit the

dissemination of another viewpoint that it finds offensive or "demeaning," because the "point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Group, 515 U.S. 557, 574 (1995). Such distinctions are viewpoint based, not merely reasonable content restrictions.

By its very nature, a prohibition against ads that are "hostile" to an individual or a group of individuals is viewpoint based. The guideline would permit ads from Catholics, Pentecostals, Jehovah's Witnesses, Muslims and others stating their beliefs -- their "viewpoints" -- that their religions were "set up" by God.[6] The MBTA, however, refuses to permit Ridley to state the

_____

[6]Claims of a unique holy charter and exclusive salvation are commonplace in western religion. The examples below are not dissimilar from the position espoused by Ridley in her third advertisement:

The Roman Catholic Church: "This is the sole Church of Christ, which in the Creed we profess to be one, holy, catholic and apostolic." Catechism of the Catholic Church #811. "There is but one holy Catholic and apostolic church, outside of which there is no salvation . . . it is altogether necessary for salvation for every creature to be subject to the Roman Pontiff." 1 Vatican Council II 364-65 (Austin Flannery, O.P., ed.).

Jehovah's Witnesses: "Consider too, the fact that Jehovah's organization alone, in all the earth, is directed by God's holy spirit or active force." The Watchtower, July 1, 1973, at 402.

Church of Jesus Christ of Latter-day Saints (Mormon): "This is not just another Church. This is not just one family of Christian churches. This is the Church and the kingdom of God, the only true Church upon the face of the earth, according to the Lord's own words." Ezra Taft Benson, The Teaching of Ezra Taft Benson 164-5 (1988). "Behold there are save two churches only; the

opposite viewpoint: her belief that these religions were not "set up" by God, but are "false," and that only her belief is correct. This is unquestionably viewpoint discrimination, as "[t]he essence of viewpoint-based discrimination is the state's decision to pick and choose among similarly situated speakers in order to advance or suppress a particular ideology or outlook." Berner v. Delahanty, 129 F.3d 20, 28 (1st Cir. 1997).

The MBTA's justification for censoring Ridley's religious expressions in the third advertisement is the suggestion that some riders might take offense to its content. This is not a sufficient reason to stifle speech protected by the First Amendment. See Planned Parenthood Ass'n/Chicago Area v. Chicago Transit Auth., 767 F.2d 1225, 1230 (7th Cir. 1985) ("We question whether a regulation of speech that has as its touchstone a government official's subjective view that the speech is 'controversial' could ever pass

---

one is the Church of the Lamb of God and the other is the churches of the devil; wherefore who so belongeth not to the church of the lamb of god belongeth to that great church; which is the mother of abominations; and she is the whore of all the earth". Book of Mormon, 1 Nephi 14:10.

Islam: "If anyone desires a religion other than Islam (submission to Allah) never will It be accepted of Him." Qur'aan, Soorah Aal'imraan 3:85.

Indeed, the MBTA guideline would prohibit even expression of the First Commandment, which admonishes believers: "Thou shalt have no other gods before me." Exodus 20:3. This mandate would have to be rejected as offensive to non-Judeo-Christians because it is "hostile" to and "disparages" believers in deities other than the Judeo-Christian god.

constitutional muster."); see also Penthouse Int'l, Ltd. v. Koch, 599 F. Supp. 1338, 1349-50 (S.D.N.Y. 1984) (poster cannot be prohibited in subway stations because its content is offensive to some). What the MBTA fails to understand is that "[z]ealots have First Amendment rights too." Pinette v. Capitol Square Review and Advisory Bd., 30 F.3d 675, 680 (6th Cr. 1994), aff'd on other grounds, 515 U.S. 753, 760 (1995). I invite the majority to take note of that principle and conclude, as I do, that the MBTA engaged in viewpoint discrimination in refusing Ridley's third submission.

## II.  **Forum analysis**

Although I find it unnecessary and ill-advised to engage in forum analysis in these cases, it is appropriate that I comment on the majority's conclusions that the MBTA has not created a designated public forum by opening its facilities to advertisers expressing a broad range of commercial and non-commercial views. Like the Second and Third Circuits, I find that this kind of advertising program on public transportation facilities converts them into a designated public forum. See N.Y. Magazine v. Metro. Transp. Auth., 136 F.3d 123, 129-30 (2d Cir. 1998) (concluding that advertising space on outside of city buses was a designated public forum); Christ's Bride Ministries, Inc. v. S.E. Pa. Transp. Auth., 148 F.3d 242, 252-55 (3d Cir. 1998) (finding that transportation authority had created a designated public forum by accepting a variety of advertisements, despite its rejection of a few such

-77-

advertisements based on their content), cert. denied, 525 U.S. 1068 (1999); see also AIDS Action Committee v. MBTA, 849 F. Supp. 79, 83 (D. Mass. 1994) (finding that MBTA's advertising space in subway and trolley cars is a public forum), aff'd on other grounds, 42 F.3d 1 (1st Cir. 1994).

A designated public forum may be "created by government designation of a place or channel of communication for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects." Cornelius, 473 U.S. at 802 (citing Perry, 460 U.S. at 45, 46 n.7). Even if the government was not obligated to open the designated public forum or to retain its open character indefinitely, as long as the forum is generally open "it is bound by the same standards as apply in a traditional public forum." Perry, 460 U.S. at 46.

As discussed by the majority, the key inquiry is whether the MBTA intended to designate its advertising space as a public forum, a question we must answer by considering (1) the MBTA's policy and practice regarding its advertising space, and (2) the nature of the MBTA's advertising space and its compatibility with expressive activity. Cornelius, 473 U.S. at 802.

## A.   The MBTA's Policy and Practice

For the government's policy and practice to create a designated public forum, "the government must intend to make the property 'generally available' to a class of speakers." Ark. Educ.

Television Comm'n v. Forbes ("AETC"), 523 U.S. 666, 678 (1998)
(quoting Widmar v. Vincent, 454 U.S. 263, 264 (1981)).  Change the
Climate asserts[7] that the MBTA's policy and practice have made its
advertising space generally available to commercial and non-profit
organizations for the expression of views by anyone willing to pay
its advertising fees.  The MBTA does not dispute that any
commercial or non-commercial advertiser may submit advertisements
under its policy, and that it has intentionally facilitated access
for all non-profit organizations by offering them a half-price
discount on the fees charged to commercial advertisers.

As a preliminary matter, it is appropriate to state that
the fact that the MBTA has chosen to include in its guidelines an
assertion to the effect that it "intends that its facilities
constitute nonpublic forums" should not be determinative of that
issue.  Otherwise, such a self-serving approach would allow the
government to simply declare property a non-public forum whenever
conflicts of this sort arose.  See Int'l Soc. for Krishna
Consciousness v. Lee, 505 U.S. 672, 695 (1992) (Kennedy, J.,
concurring).  Similarly, the fact that a particular category of
speech, such as that regarding tobacco sales, is excluded from a
forum does not preclude the designation of a public forum.  New
York Magazine, 136 F.3d at 129-30 ("[I]t cannot be true that if the

_____

[7]I again note that Ridley has never argued forum analysis.
Such discussion is irrelevant to Ridley's viewpoint and vagueness
arguments, with which I fully agree.

government excludes any category of speech from a forum . . . that forum becomes ipso facto a non-public forum."). Nor does the fact that the MBTA charges a fee for the use of its advertising space preclude the creation of a designated public forum, because "[d]espite the existence of a fee, the [government] may nevertheless have allowed indiscriminate use" of the forum by "anyone willing to pay." Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of the City of Chicago, 45 F.3d 1144, 1155 (7th Cir. 1995).

Furthermore, I believe it is worthwhile to consider the situation today within the context of the MBTA's advertising policies in the years leading up to the events at issue in this litigation. I begin by noting that in 1994, in AIDS Action, we found that the advertising policy promulgated by the MBTA was "scarcely coherent, [and] invite[d] the very discrimination that occurred in [that] case, and was properly enjoined." 42 F.3d at 12. In the period between AIDS Action and the present litigation, from 1995 to at least 1999, the MBTA required that:

> [a]ll advertisements at any time inserted or placed by the Contractor in or upon any locations or display devices shall be of a reputable character, and the appearance of all advertisements shall be acceptable to and in accordance with the [MBTA's] Standards for Character and Appearance of Advertisements. No libelous, slanderous, or obscene advertisements, may be accepted by the Contractor for display in or upon the Authority's transit facilities. Advertisements shall be submitted in advance

to the Authority for review at the Authority's request or whenever the Contractor reasonably believes such advertisements may be objectionable within the meaning of this Article.

This policy was supplemented by an April 21, 1995 letter from the MBTA Interim General Manager, Robert Mabardy, which contained additional guidelines:

The MBTA will refuse any advertisement that is indecent to child viewers, or is of a nature to frighten children, either emotionally or physically.

. . .

These guidelines shall not be deemed to prohibit indecent or frightening language that could be considered double entendre, provided that, if a child asked an adult the meaning of such indecent or frightful language, the adult could give a reasonable and truthful answer without reference to indecent or frightening activities or language.

In 1999, the MBTA formulated new bid specifications for transit advertising, which contained a new version of the advertising policy. The 1999 bid specifications prohibited the display of advertisements for tobacco products and echoed the 1992 bid specifications, with the following provisions added:

The MBTA will not accept advertisements containing violent criminal content, firearms, profane content, promotional materials that is harmful to juveniles, and advertisements that denigrate groups based on gender, religion, race, ethnic or political affiliation.

Subsequently, the MBTA went through two more revisions of its guidelines, as described in the majority opinion. A new set of

"Interim Guidelines Regulating MBTA Advertising," promulgated on April 12, 2002, provided that the MBTA "shall not display or maintain any advertisement" that is:

> Demeaning or disparaging. The advertisement contains material that demeans or disparages an individual or group of individuals on the basis of race, color, religion, national origin, ancestry, gender, age, disability, ethnicity, or sexual orientation.

On January 17, 2003, the MBTA issued yet another revision of its guidelines, removing the language concerning race, color, etc., and adding the "prevailing community standards" metric for determining whether material is demeaning or disparaging.

As a general rule, "the more restrictive the criteria for admission and the more administrative control over access, the less likely a forum will be deemed public." Hopper v. City of Pasco, 241 F.3d 1067, 1078 (9th Cir. 2001). Over the years, the MBTA's criteria for admission have been confusing at best, and it has always left the initial determinations of whether advertisements may run afoul of the advertising policy to the subjective evaluation of a private contractor. Those advertisements sent to the MBTA for review have received a similarly subjective evaluation from MBTA employees. Thus, the subjective standards in these policies create a potential for abuse, specifically the potential for viewpoint discrimination. See Hopper, 241 F.3d at 1079 ("The potential for abuse of such unbounded discretion is heightened by the inherently subjective nature of the standard itself.").

I emphasize that

> [t]he government may not 'create' a policy to implement its newly-discovered desire to suppress a particular message. Neither may the government invoke an otherwise unenforced policy to justify that suppression. Therefore, the government's stated policy, without more, is not dispositive with respect to the government's intent in a given forum.

Air Line Pilots, 45 F.3d at 1153 (citations omitted). In determining whether the MBTA has designated its advertising space as a public forum, then, one cannot rely on recent attempts by the MBTA to revise its advertising policy during the course of this litigation to indicate its prior intent on the nature of its advertising space as a forum.

Similarly, the MBTA's written policies cannot be considered without reference to their application in the years preceding this action. In determining whether the government has designated property to be a public forum, we have previously stated that "actual practice speaks louder than words." Grace Bible Fellowship, Inc. v. Maine Sch. Admin. Dist. No. 5, 941 F.2d 45, 47 (1st Cir. 1991). "[C]onsistency in application is the hallmark of any policy designed to preserve the non-public status of a forum. A policy purporting to keep a forum closed (or open to expression only on certain subjects) is no policy at all for purposes of public forum analysis if, in practice, it is not enforced or if exceptions are haphazardly permitted." Hopper, 241 F.3d at 1076. In AIDS Action, we admonished the MBTA that if it were to be

allowed to restrict speech, "it will, at the least, need to act according to neutral standards, and it will need to apply these standards in such a way that there is no appearance that 'the [government] is seeking to handicap the expression of particular ideas.'" 42 F.3d at 13 (quoting R.A.V., 505 U.S. at 394). In practice, the MBTA has not restricted access to its advertising space in a manner sufficient to indicate an intent to maintain it as a non-public or limited public forum.

When we decided AIDS Action, we found that "despite the MBTA's attempts to present itself as a vigilant gatekeeper, the only ads other than the 1993 [AIDS awareness] ads that we know the MBTA recently rejected are certain Calvin Klein ads which somehow might have been misconstrued as endorsing the Ku Klux Klan, and an animal rights advertisement featuring a photograph of a maimed dog." Id. at 9. In reviewing the MBTA's application of its advertising policies since AIDS Action, I find that little has changed. During the five years preceding Change the Climate's first interactions with PTD, between 1995 and 1999, the MBTA refused to post only fifteen advertisements. Examples include an advertisement for the movie Psycho, which featured an image of a nude woman in a shower with blood at the bottom, rejected because it was "in conflict with the MBTA's dignity in the workplace and the Commonwealth's domestic violence programs," neither of which criteria are set forth in the MBTA's advertising policy. Rejection

of ads also appears to have occurred on an <u>ad</u> <u>hoc</u>, subjective basis. For example, MBTA refused to post an advertisement from the conservation organization Surfriders, aimed at discouraging people from leaving cigarette butts on the beach, apparently because it included images of people smoking. The MBTA posted, however, advertisements for Al Italia airline that featured a woman holding a cigarette with the caption, "Create a buzz." Thus, the <u>ad</u> <u>hoc</u> rejection of a handful of ads over the past decade cannot serve as the basis for concluding that MBTA intended its advertising space as a non-public forum.

**B.** **<u>The Nature of the Forum and Its Compatibility with Expression</u>**

It is also necessary to examine "the nature of the property and its compatibility with expressive activity to discern the government's intent." <u>Cornelius</u>, 473 U.S. at 802 (citations omitted). This inquiry involves examining "the relationship between the reasons for any restriction on access and the forum's purpose." <u>United Food and Commercial Workers Union, Local 1099</u> v. <u>Southwest Ohio Reg'l Transit Auth.</u>, 163 F.3d 341, 351 (6th Cir. 1998). The district court in <u>Change the Climate</u> found that "[t]he principal purpose of the MBTA using some of this space for advertising is to earn revenue in support of the MBTA's goal of providing transportation." 214 F. Supp. 2d 125, 132 (D. Mass. 2002). In general, "the courts will infer an intent on the part of the government to create a public forum where the government's

justification for the exclusion of certain expressive conduct is unrelated to the forum's purpose, even when speakers must obtain permission to use the forum." United Food, 163 F.3d at 351. Forum analysis must therefore "involve a careful scrutiny of whether the government-imposed restriction on access to public property is truly part of 'the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property.'" Id. at 351-52 (quoting Perry, 460 U.S. at 49). Courts will hold "that the government did not create a public forum only when its standards for inclusion and exclusion are clear and are designed to prevent interference with the forum's designated purpose." Id.

The Supreme Court has indicated that "[i]n cases where the principal function of the property would be disrupted by expressive activity, the Court [has been] particularly reluctant to hold that the government intended to designate a public forum." Cornelius, 473 U.S. at 804. The MBTA can hardly argue that its advertising space is generally incompatible with expressive activity, or that the MBTA's principal function of providing transportation would be disrupted by the expressive activity proposed by Change the Climate or Ridley, since it has routinely made its advertising space available to both commercial and public-issue advertising on a wide range of issues without any disruption. See, e.g., Planned Parenthood, 767 F.2d at 1232 ("[S]ince CTA already permits its facilities to be used for public-issue and

political advertising, it cannot argue that such use is incompatible with the primary use of the facilities."). It is clear that the MBTA "created a forum that is suitable for the speech in question . . . ." Christ's Bride, 148 F.3d at 252.

The majority wrongly emphasizes the MBTA's proprietary role with regard to its advertising space. In an early case addressing advertising on public transit systems, the Supreme Court held that because "the city is engaged in commerce," and "[t]he car card space, although incidental to the provision of public transportation, is a part of the commercial venture," "a city transit system has discretion to develop and make reasonable choices concerning the type of advertising that may be displayed in its vehicles." Lehman v. City of Shaker Heights, 418 U.S. 298, 303 (1974). Since Lehman, public forum analysis has developed considerably but has continued to find that "[w]here the government is acting as a proprietor, managing its internal operations, rather than acting as lawmaker with the power to regulate or license, its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject." Lee, 505 U.S. at 678. The district court's finding that "[t]he principal purpose of the MBTA using some of this space for advertising is to earn revenue in support of the MBTA's goal of providing transportation," Change the Climate, 214 F. Supp. 2d at 132, would suggest that the MBTA is acting as a proprietor. In Lee, however, it was "the commercial

-87-

and restricted nature of an airport concourse which suggested that the government did not intend the concourse to be primarily a forum for expression." Christ's Bride, 148 F.3d at 250 ("We do not read Lee . . . to mean that every time the government runs a commercial enterprise it has, by definition, decided not to create an open forum."). While the primary purpose of the MBTA's advertising space may be to generate revenue, it is clear that the MBTA's policy of allowing and, in fact, encouraging non-commercial advertising (by offering a discount) demonstrates its judgment that such advertising does not conflict with its proprietary interests. Air Line Pilots, 45 F.3d at 1157 (finding no "indication that permitting public interest groups to advertise would threaten the vitality of the City's commercial interests in deriving revenue from the advertising displays."). Having opened its advertising space for non-commercial discourse, the MBTA now wishes to act as a lawmaker, and not as a proprietor, in attempting to regulate the content of that discourse, which indicates that it has designated its advertising space a public forum. New York Magazine, 136 F.3d at 129 ("Where the government acted for the purpose of benefitting the public, . . . the Court has found a public forum.").

In some contexts, however, limiting advertising space has been found consistent with a proprietary purpose. In Uptown Pawn & Jewelry, Inc. v. City of Hollywood, 337 F.3d 1275, 1279 (11th Cir. 2003), discussed by the majority, Maj. op. at 28, the Eleventh

Circuit concluded that the City's prohibition on pawn shop advertising on park benches "evidences an intent, not to create a public forum, but to act in a proprietary capacity to manage a commercial venture." Id. at 1281. Here, however, there is no evidence that posting Change the Climate's or Ridley's advertisements would have any adverse effect on the MBTA's ability to generate revenue through its advertising space, regardless of whether their messages are controversial. As previously described, the MBTA has posted a range of commercial and public-issue advertising that would undermine any argument that advertisements like those now proposed could be excluded in the interests of protecting the revenue-generating capacity of its advertising space. Here, then, "the purpose of the forum does not suggest that it is closed, and the breadth of permitted speech points in the opposite direction." Christ's Bride, 148 F.3d at 253.

Moreover, the Supreme Court has considered the government's practice of excluding speech from a forum "not because the exclusion of categories of speech creates a non-public forum, but because the nature of the excluded categories sheds light on whether the government was acting as a proprietor or a regulator." New York Magazine, 136 F.3d at 130; Cornelius, 473 U.S. at 805 ("The decision of the [g]overnment to limit access to the [forum] is not dispositive in itself; instead, it is relevant for what it suggests about the [g]overnment's intent in creating the forum.").

In Lehman, the Court found that the 26-year, consistently enforced ban on non-commercial advertising was consistent with the government's role as a proprietor, because "[r]evenue earned from long-term commercial advertising could be jeopardized by a requirement that short-term candidacy or issue-oriented advertisements be displayed." 418 U.S. at 304. Other courts have followed Lehman to hold that a total ban on non-commercial speech may be consistent with the government acting in a proprietary capacity and have found transportation advertising spaces to be non-public fora when the government "consistently promulgates and enforces policies restricting advertising . . . to commercial advertising." Children of the Rosary v. City of Phoenix, 154 F.3d 982, 978 (9th Cir. 1998); Lebron v. Nat'l R.R. Passenger Corp. (AMTRAK), 69 F.3d 650, 656 (2d Cir. 1995). When the advertising space has been opened to non-commercial speech, however, courts have distinguished the advertising space in question from the total ban on non-commercial speech present in Lehman.

> Disallowing political speech, and allowing commercial speech only, indicates that making money is the main goal. Allowing political speech, conversely, evidences a general intent to open a space for discourse, and a deliberate acceptance of the possibility of clashes of opinion and controversy that the Court in Lehman recognized as inconsistent with sound commercial practice.

New York Magazine, 136 F.3d at 130; Lebron v. Washington Metro. Area Transit Auth., 749 F.2d 893, 896 (D.C. Cir. 1984)("There is no

. . . question that WMATA has converted its subway stations into public fora by accepting . . . political advertising."). The MBTA has no longstanding policy of prohibiting public-issue advertisements like Change the Climate's or Ridley's. While excluding political campaign speech from its advertising space, the MBTA has allowed and intentionally encouraged non-commercial advertising, including public-issue advertising regarding social issues like drugs, crime, violence, abortion, AIDS, suicide, and religion.

The provisions of the MBTA's Revised Interim Guidelines under which it refused to post Change the Climate's advertisements also indicate that it is acting as a regulator/lawmaker and not as a proprietor. The guidelines prohibit the posting of any advertisement that "promotes or encourages, or appears to promote or encourage, the use or possession of unlawful or illegal goods or services," or unlawful conduct. The MBTA has not offered any commercial justification for its interest in prohibiting advertisements containing such material, and we see "no commercial reason why [the MBTA] has any special interest in [preventing unlawful conduct]; [the MBTA's] interest is only the interest in upholding the law because it is the law." New York Magazine, 136 F.3d at 130. This is certainly a regulatory and not a proprietary interest.

Other courts have similarly found the advertising spaces of various urban transportation systems to be a designated public forum when the government has allowed "a wide variety of commercial, public-service, public-issue, and political ads," Planned Parenthood, 767 F.2d at 1232, "political and other non-commercial advertising generally," New York Magazine, 136 F.3d at 130, or "public-service, public-issue, and political advertisements in addition to traditional commercial advertisements." United Food, 163 F.3d at 346. In these cases, contrary to the majority's assertions, the agency's control over public issue advertising was not unlike that exercised by the MBTA in practice.

In Christ's Bride, the Southeastern Pennsylvania Transportation Authority (SEPTA) was deemed a designated public forum because, while SEPTA asserted its right to refuse advertising deemed "objectionable for any reason," SEPTA had the "practice of permitting virtually unlimited access to the forum." 148 F.3d at 251-52. The Third Circuit found that in practice "SEPTA has exercised control over only three ads, two of which had graphics to which SEPTA objected, and one of which solicited personal injury cases that could be directed against SEPTA." Id. at 252.

In United Food, the Southwest Regional Transit Authority (SORTA) had rejected an advertisement under a provision of its advertising policy that prohibited "[a]dvertising of controversial public issues that may adversely affect SORTA's ability to attract

and maintain ridership." 163 F.3d at 352. The Sixth Circuit concluded that "the lack of definitive standards guiding the application of SORTA's advertising policy permits SORTA, like SEPTA, to reject a proposed advertisement deemed objectionable for any reason." 163 F.3d at 354. Under these circumstances, the transportation authorities' contention that the advertising at issue was incompatible with the nature of the forum created by their advertising spaces could not be sustained. The Sixth Circuit's reasoning is instructive:

> We also find that SORTA's stated purpose for limiting advertising on buses only tenuously related, at best, to the greater forum's intended use. This is not a situation like that in Cornelius, where the government established a controlled solicitation process to prevent disruption in the workplace, or [AETC], where a public broadcasting system logistically could not possibly accommodate all political candidates, or even [Perry], where a high school had a direct interest in controlling access to its internal mail system. Here there is no established causal link between SORTA's goal of enhancing the environment for its riders, enhancing SORTA's standing in the community, and enabling SORTA to attract and maintain its ridership, and its broad-based discretion to exclude advertisements that are too controversial or not aesthetically pleasing. Although political and public-issue speech is often contentious, it does not follow that such speech will necessarily frustrate SORTA's commercial interests. Rather, it may be the case that only in rare circumstances will the controversial nature of such speech sufficiently interfere with the provision of Metro bus services so as to warrant excluding a political or public-issue advertisement.

United Food, 163 F.3d at 354.

Admittedly, the MBTA has not opened its advertising space to all public-issue advertising except that which it deems "objectionable for any reason," id., but has instead promulgated written advertising policies and exercised control over a handful of advertisements in the five years prior to the events at issue here. Still, the incoherent written policies and the occasional, subjective exercise of control are insufficient to demonstrate an intent by the MBTA to close its advertising space as a public forum when it routinely posts public-issue advertisements on all manner of social issues.

Thus, the MBTA's policy and practice regarding its advertising space, and the nature of that space as created and managed by the MBTA, demonstrates an intent by the MBTA to create a designated public forum.

Finally, I must note that, while not a sidewalk or city park, the MBTA's facilities are the modern analogue to these traditional public fora. As mentioned above, 2.5 million people in the Greater Boston area use the MBTA's facilities, and its 170 bus and trolley routes, 4 subway lines, and 13-branch commuter rail network transit at some point of their routes through or across traditional public fora. In addition to the car cards at issue in this case, the MBTA allows advertising on the outside of its vehicles, which are obviously displayed as they transit through the

public streets.  Some of the cars on some of the subway lines that travel above ground are even painted in such a way that the whole exterior of the car constitutes, in effect, an advertisement.  The MBTA also allows advertising on the walls of the numerous bus and trolley shelters that sit on the public sidewalks and can be seen from the public thoroughfare.  Thus, in addition to the traveling public, the MBTA's advertising influence reaches into those on the traditional public fora -- the streets and sidewalks of Greater Boston.  As stated above, this means that the MBTA is in a position to control 40,000 advertising spaces for the dissemination of information to a large segment of the region's population.  It is disquieting, to say the least, that the majority would allow the government to control the content of the information to which the public is exposed through these advertising spaces.  The MBTA's advertising system is indeed a powerful tool with which to influence public opinion, one which should be opened to the crucible of competing viewpoints to the largest extent possible.

### III.  Conclusion

Although I concur with the majority's conclusion that the MBTA engaged in viewpoint discrimination when it rejected Change the Climate's proposed advertisements, I dissent from its failure to recognize similar discrimination with regard to Ridley's advertisements.  I further dissent from the majority's decision to engage in forum analysis, and from the outcome thereof.

## Appendix

To be posted shortly.